**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Charles V. LEAKE, Defendant–Appellant.**

No. 95–5687.

United States Court of Appeals,
Sixth Circuit.

Argued May 24, 1996.

Decided Sept. 9, 1996.

Terry M. Cushing, Asst. U.S. Atty., Stephen G. Frye, Asst U.S. Atty. (argued and briefed), Office of U.S. Atty., Louisville, KY, for plaintiff–appellee.

Theodore H. Lavit (briefed), Stephen B. Humphress (argued and briefed), Lavit & Abell, Lebanon, KY, for defendant–appellant.

Before: RYAN and NORRIS, Circuit Judges; DOWD, District Judge *.

DOWD, District Judge.

## I. INTRODUCTION

This case requires consideration of the "fruit of the poisonous tree" teachings against the background of our earlier decision that the 1988 search of defendant Charles Leake's residence violated the Fourth Amendment. The defendant was indicted on November 20, 1991 for the substantive offense of possession of marijuana on April 15, 1988, the date of the unlawful search. The defendant was also charged with conspiracy with respect to marijuana covering an earlier period of time. Prior to this appeal, Leake moved to suppress evidence seized during the April 15, 1988 search of his residence. The district court held that search unconstitutional. The trial of Leake was delayed with his acquiescence while the government appealed the district court's suppression. This court affirmed the district court. *United States v. Leake*, 998 F.2d 1359 (6th Cir.1993).

Following the appeal, the government indicated that it was prepared to prosecute the conspiracy counts. Leake moved to suppress additional evidence on the ground that it constituted "fruit of the poisonous tree" in that it was derived from the unconstitutional search. The government argued that the independent source and inevitable discovery

doctrines permitted admission of the additional evidence and offered testimony in a suppression hearing in support of its position. The district court adopted the magistrate judge's report which recommended denying Leake's motion. Leake then entered a conditional plea of guilty to a single count of conspiracy and was sentenced to a term of imprisonment for 46 months. On appeal, Leake challenges the denial of his motion to exclude the additional evidence. For reasons that follow, we reverse the judgment of the district court, vacate the sentence and remand for further proceedings.

## II. "FRUIT OF THE POISONOUS TREE"

The exclusionary rule bars the admissibility of items seized during an unconstitutional search, *Weeks v. United States*, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914), and of testimony concerning knowledge acquired during such a search. *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961).

An offshoot of the rule is the "fruit of the poisonous tree" doctrine, which bars evidence which, though not obtained in the illegal search, was derived from information or items obtained in the search. *See Murray v. United States*, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988) (doctrine "prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary [illegally obtained] evidence"). The doctrine ensures that the government cannot achieve indirectly what it is forbidden to accomplish directly. As Justice Frankfurter articulated, "To forbid the direct use of methods but to put no curb on their full indirect use would only invite the very methods deemed inconsistent with ethical standards and destruction of personal liberty." *Nardone v. United States*, 308 U.S. 338, 340, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939).

At the same time, evidence obtained from an illegal search does not become "sacred

---

* The Honorable David D. Dowd, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

and inaccessible." *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920). So that the government "is not put into a *worse* position simply because of some earlier police error or misconduct," the government can show that evidence that might be excluded under the fruit of the poisonous tree doctrine should be admitted under another rationale. *Nix v. Williams,* 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377 (1984) (emphasis in original). The government in this case offers two theories under which evidence originally obtained in or derived from the illegal search of Leake's residence should be admissible: the independent source doctrine and the inevitable discovery doctrine.

■ Under the independent source doctrine, evidence will be admitted if the government can show it was discovered through sources "wholly independent of any constitutional violation." *Nix,* 467 U.S. at 442–43, 104 S.Ct. at 2508–09 (1984). The doctrine ensures that the government is not penalized for wrongdoing when such wrongdoing would not bear on the outcome of the case. "In the classic independent source situation, information which is received through an illegal source is considered to be cleanly obtained when it arrives through an independent source unrelated to and independent of the unconstitutional search." *Murray v. United States,* 487 U.S. at 538–39, 108 S.Ct. at 2534 (quotation and citation omitted).

■ The inevitable discovery doctrine is conceptually more problematic than the independent source doctrine because it involves a degree of deducing what would have happened rather than simply evaluating what actually happened. Under the inevitable discovery doctrine, evidence may be admitted if the government can show that the evidence inevitably would have been obtained from lawful sources in the absence of the illegal discovery. *Nix,* 467 U.S. at 444, 104 S.Ct. at 2509.

■ By its nature, the inevitable discovery doctrine requires some degree of speculation as to what the government would have discovered absent the illegal conduct. Speculation, however, must be kept to a mini-

mum; courts must focus on "demonstrated historical facts capable of ready verification or impeachment." *Id.* at 444–45 n. 5, 104 S.Ct. at 2509 n. 5. The burden of proof is on the government to establish that the tainted evidence "would have been discovered by lawful means." *Id.* at 444, 104 S.Ct. at 2509.

■ The Sixth Circuit has noted that the inevitable discovery exception "applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or* other compelling facts establishing that the disputed evidence inevitably would have been discovered." *United States v. Kennedy,* 61 F.3d 494, 499 (6th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996) (emphasis in original). The inevitable discovery doctrine "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." *Id.* at 498 (quoting *United States v. Eng,* 971 F.2d 854, 861 (2d Cir.1992)).

In evaluating whether evidence should be admitted under either the independent source or the inevitable discovery doctrines, courts should keep in mind the underlying question: "whether, granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963); *United States v. Buchanon,* 72 F.3d 1217, 1226 (6th Cir.1995).

Against the background of these well established principles of law, we turn to a consideration of this fact-intensive dispute which includes numerous events involving many persons, some of whom were co-defendants in the marijuana conspiracy charged in count one of the indictment.

### III. BACKGROUND FACTS

The long history of this case dates back to October 1987, when a hunter told the Indiana State Police ("ISP") that he had observed

marijuana growing on a farm in Owen County, Indiana. During a search executed pursuant to a valid warrant, the ISP found a 60–acre patch of marijuana on the farm. The ISP arrested Charles Atkinson when he arrived at the farm later that day. Among Atkinson's possessions was paperwork referencing another farm in Paris, Missouri. Drug Enforcement Agency ("DEA") agents and Missouri State Police officers went to the Paris farm on October 12, 1987. Agents there interviewed William Ricky Sapp and observed two individuals fleeing the farm. While in pursuit of the fleeing individuals, agents observed several marijuana plants in a barn on the farm. Agents promptly obtained a search warrant and seized 6,000 pounds of marijuana on the property.

On October 22 and 23, 1987, DEA agents interviewed the real estate agents involved in the sale of the Paris farm in the spring of 1987. The Realtors indicated that the Paris farm was sold to individuals identifying as themselves Charles Harrison and Bob Wall. The Realtors later identified Harrison and Wall as Atkinson and Joseph O'Daniel, respectively.

Agents subpoenaed Atkinson's phone records and identified a number of telephone calls to the home phone of Joseph O'Daniel, who became a central target of the investigation.[1] In March 1988, Atkinson agreed to cooperate with the DEA. He revealed the existence of a marijuana growing and distribution enterprise and implicated Joseph O'Daniel, Alex Soloweyko, Andrew Brady and William Ricky Sapp. Atkinson identified Joseph O'Daniel as the financier and primary distributor of the marijuana. Atkinson discussed his involvement in the operation of two farms in Owen County, Indiana, and a third farm located near Quincy, Illinois. Atkinson told officers that Brady ran one of the farms in Owen County and that Soloweyko, Joseph O'Daniel, and Dennis O'Daniel were involved in managing both of the Owen County farms. Atkinson did not mention Leake.

In an unrelated investigation, on April 15, 1988, Louisville, Kentucky, police searched Leake's home.[2] DEA agents neither knew about nor participated in the search. During the search, police seized approximately 305 pounds of marijuana, an identification card belonging to Leake, a note, mail addressed to Leake and his then-girlfriend, Robin,[3] and a packing slip. During an interview with police a few days later, Robin provided officers with a list containing the names of Joe Pat (Joseph) O'Daniel and his alias, Bob Wall; Dennis O'Daniel and his alias, Fred; and (most important to this appeal) Leake and his alias, "Johnny S. Sandusky." The list also identified two Missouri towns—Ewing and Philadelphia—as locations of Leake's marijuana activities and provided two Missouri phone numbers.

In the interview Robin also told Louisville police about a 1987 trip in which she and Leake rented a U–Haul trailer in Missouri, loaded it with marijuana with the help of Joseph O'Daniel, and drove it to Bowling Green, Kentucky. Based on Robin's statement (but not until 1991),[4] the government subpoenaed the records of U–Haul Inc., and acquired a receipt showing that Leake rented

---

1. The record indicates O'Daniel's phone records were in turn subpoenaed and that such records showed a number of telephone calls to Leake. However, there is no reference in the record to when O'Daniel's records were subpoenaed. Given the seven-year life of this investigation, any estimate on when the records were subpoenaed would be speculative.

2. Louisville police had received a telephone call from a person refusing to identify himself who said he had been in Leake's home to perform work as a tradesman and had observed a large stash of marijuana in the basement. Police staked out the home for two nights but found no suspicious activity. A judge issued a search warrant based upon the affidavit of the police officer who had taken the anonymous telephone call. This court held that the warrant was issued without a showing of probable cause. *Leake,* 998 F.2d at 1367.

3. Robin married Leake during this sequence of events and is therefore referred to as both Robin Grimes and Robin Leake in various documents, according to their timing. This opinion will simply refer to her as "Robin." Charges against Robin were dismissed pursuant to Leake's plea agreement.

4. The chronology of the record reflects an unexplained three-year gap between the time of the search of the Indiana farms and the completion of major aspects of the investigation.

a trailer during the time period described by Robin.

In June 1988 a DEA task force searched the Ewing, Missouri, farm.[5] It subsequently (at a date not determinable from the record) subpoenaed utility records as well as registration records for vehicles found on the property. According to the testimony of DEA agent Richard Badaracco at the suppression hearing, the utilities originally were registered in the name of John Sandusky before being transferred to the name of Charles Childress[6] and TOP, Inc., care of Bob Wall, Louisville, Kentucky. Vehicle registration records showed that the chain of title of one of the vehicles included the names of Leake, John Sandusky, and Robert O'Daniel, according to Badaracco.

In August 1991, investigators interviewed Sapp.[7] Badaracco testified at the suppression hearing that Sapp implicated Leake in the conspiracy. What Sapp said about Leake, and how Leake's name arose, is not determinable from the record. Badaracco answered in the affirmative at the suppression hearing when asked whether Sapp implicated Leake, but he provided no details. (J.A. at 222). Badaracco admitted he did not know whether Sapp knew that Leake used the alias "John Sandusky." (*Id.* at 185).

On November 20, 1991, a federal grand jury indicted Leake, Robin, Joseph O'Daniel, and four others.[8] Leake was named in three counts of the indictment. Count One charged all defendants with conspiracy to unlawfully manufacture and possess with intent to distribute marijuana in violation of 21 U.S.C. § 846. Count Three charged Leake and Robin with aiding and abetting each other to possess with intent to distribute

approximately 305 pounds of marijuana, the amount found in Leake's basement pursuant to the Louisville police search, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Count Four charged Leake and five other defendants with aiding and abetting each other to manufacture marijuana, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.

Leake moved to suppress the evidence seized during the April 1988 search of his home. This court upheld the lower court's decision to suppress the seized evidence because probable cause did not support the search warrant for Leake's house. *United States v. Leake*, 998 F.2d 1359 (6th Cir.1993). After this decision, the government proceeded with plans to prosecute Leake on Counts One and Four.

## IV. THE MOTION TO SUPPRESS

After succeeding on his original motion to suppress, Leake moved on December 7, 1993, to suppress evidence he claimed was derived from the illegally seized evidence. He claimed that investigators never would have linked him to the conspiracy but for the information obtained as a result of the illegal search. Specifically, he sought exclusion of a) evidence establishing a connection between himself and the Owen County, Indiana, farms; b) evidence establishing a connection between himself and the Missouri farms; c) evidence obtained from Missouri real estate agents who were questioned by DEA agents; d) evidence regarding Atkinson's debriefing on March 31, 1988; e) evidence acquired in the illegal search of his home, including the subsequent statements of Robin;[9] f) evidence relating to the alias

---

5. Although the search closely followed the illegal search of Leake's residence, DEA agent Richard Badaracco testified at the suppression hearing that agents were acting on information provided by Atkinson in his March 1988 interview. (Joint Appendix ["J.A."] at 173–74; Brief of United States at 8).

6. Charles Childress is an alias for co-conspirator Gerald Hays, who was indicted with Leake and pleaded guilty to conspiracy charges.

7. Sapp was not named in the indictment in this case. Badaracco testified that he was acquitted in federal court of drug offenses related to the

search of the Paris farm but that he later pleaded guilty to state charges related to marijuana distribution. (J.A. at 164–65).

8. The other defendants were Dennis O'Daniel, Andrew T. Brady, Gerald Hays and Terry Ford. All defendants other than Robin have pleaded guilty and been sentenced to prison. Charges against Robin were dismissed pursuant to Leake's plea agreement.

9. The government concedes that the items found in Leake's residence, the list provided by Robin which identified Leake as John Sandusky, and

"John Sandusky'"; g) the U–Haul receipt and phone records acquired by the government; and h) any statements by Joseph O'Daniel which incriminate Leake or any evidence gathered as a result of O'Daniel's statements. (Docket 241).

On January 6, 1994, while the motion to suppress was pending, DEA agent Badaracco and Assistant U.S. Attorney Stephen Frye visited Joseph O'Daniel in federal prison. They reminded O'Daniel that his plea bargain agreement required him to cooperate fully with the United States and told him that violating that agreement could subject him to re-sentencing.[10] (J.A. at 178–79).

Following the government's interview of O'Daniel, the district court conducted a hearing on the motion to suppress. Badaracco was the sole witness. He summarized the substance of his interview with O'Daniel. He testified that O'Daniel stated that the name "John Sandusky" was an alias for Leake. He said O'Daniel also described, to the best of his recollection, the 1987 incident in which Leake rented a U–Haul trailer to transport marijuana from Missouri to Kentucky. Although the government had no knowledge of that trip before Robin revealed it as a result of the illegal search, Badaracco testified that investigators would have discovered it during the routine course of their investigation by interviewing co-conspirators. Badaracco also testified that through routine investigative work they would have subpoenaed utility records and discovered Sandusky's name (which in fact they did after the illegal search).

Upon cross-examination, Badaracco admitted investigators had no knowledge of Leake's involvement in the conspiracy prior to the illegal search of his residence. He admitted the first time the government saw the name "John Sandusky" was in a list provided by Robin and suppressed in the

prior case. (J.A. at 211). He engaged in the following exchange with Leake's counsel:

Q. Tell us, when was the first time that the investigation of Vince Leake was focused on Vince Leake? When did it actually become the focus on him?

A. Well, the [illegal] search that took place on April 15 certainly helped us in streamlining the investigation. We would eventually target him later on, but the search that occurred on April 15 just targeted him sooner.

(J.A. at 213–14). He testified that, assuming investigators had no evidence from the illegal search, they still would have noted the name "John Sandusky" on utility records and would have asked O'Daniel, after he agreed to cooperate, of Sandusky's identity.

After listening to all of the testimony, the district judge referred the case to a magistrate judge for preparation of a report and recommendation on the suppression issue. The magistrate thus was in the same position as this court, evaluating the testimony from the cold record.

The magistrate concluded that the motion to suppress should be denied "[b]ecause the challenged evidence was obtained through sources independent of the illegal search or was evidence that would have inevitably been discovered." (J.A. at 46–47). He found that the utility records and vehicle registration, both containing the name of John Sandusky, were obtained independently of the illegal search. He said O'Daniel "and other coconspirators" identified Sandusky as Leake. (Id. at 53).[11] He found that, even without the illegally obtained evidence, the government would have learned of the U–Haul rental through Joseph O'Daniel "since O'Daniel advised officers of the events surrounding the rental ... during his [January 1994] interview." (Id. at 54).

Robin's account of the U–Haul trip are inadmissible under the exclusionary rule.

10. O'Daniel, who is serving 70 months in prison, received credit for substantial assistance to the government prior to sentencing. He could have been sentenced to up to 120 months. The government admits reminding him of these facts at the time of the January 1994 interview.

11. The only "other coconspirator[]" to identify Sandusky as Leake was Robin. Her testimony, of course, is inadmissible because it directly arose from the illegal 1987 search of Leake's residence.

The magistrate concluded, "Since the United States would have inevitably discovered that John Sandusky was used as an alias by Charles Leake and since information regarding the use of that alias was available independently of Robin Grimes Leake's list or testimony, testimony identifying Sandusky as Leake is admissible." (*Id.*).

Leake filed objections to the magistrate's report and recommendation. Leake pointed out that the government conceded it had no knowledge of his involvement in the conspiracy prior to the April 15, 1988, illegal search. He argued that everything learned about him occurred as a direct result of the illegal search. He said that the recent interview with O'Daniel was tainted because the government's purpose was to "inevitably discover" facts it became aware of through illegal means six years previously.

Pursuant to 28 U.S.C. § 636(b)(1), a party opposing a magistrate's report and recommendation is entitled to *de novo* determination of the portions of the report which are contested. Although the district court stated it engaged in a *de novo* review, it issued a cursory opinion accepting the report and recommendation in full and denying Leake's motion to suppress.[12]

Pursuant to Rule 11(a)(2) of the Federal Rules of Criminal Procedure, Leake entered a conditional plea of guilty to the conspiracy count of the indictment, reserving the right to appeal the district court's denial of the motion to suppress and to withdraw the plea if his appeal was successful. As part of the plea agreement, the government dropped the other two counts against him as well as the counts against Robin. He was sentenced to 46 months in prison and has filed this appeal.

The crux of Leake's argument on appeal is that the government would not have connected him to the marijuana operation but for the illegal search. He argues that the only evi-dence tying him to the conspiracy was the alias "John Sandusky," and every link tying Leake to the alias was either directly or derivatively obtained through the illegal search. He argues further that the main substantive evidence linking him to the conspiracy—the U–Haul incident—would not have been discovered absent the illegal search. He seeks to suppress all evidence connecting him to the alias, the U–Haul incident or any other aspect of the conspiracy on the ground that it is inadmissible "fruit of the poisonous tree."

The government concedes that it cannot use against Leake any of the evidence seized during the 1988 search, the list provided by Robin, or her statement concerning the U–Haul incident. It argues, however, that exceptions to the exclusionary rule permit admission of all evidence obtained from the list and the statement.

## V. ANALYSIS

### A. Standard of Review

In *United States v. Leake,* 998 F.2d 1359, this court held that it reviews a district court's decision on a motion to suppress under two complementary standards. *Id.* at 1362. Findings of fact are upheld unless clearly erroneous, while conclusions of law are reviewed *de novo.* *Id.*

Subsequent to *Leake,* this court held that the application of the inevitable discovery exception is a mixed question of law and fact and is reviewable *de novo.* *United States v. Kennedy,* 61 F.3d 494, 497 (6th Cir.1995). Application of the independent source doctrine is no less a mixed question of law and fact. It thus should be reviewed *de novo.* Because the district court based its denial of Leake's motion to suppress upon those two doctrines, the court reviews the decision *de novo.*[13]

---

12. The full text of the district court's opinion is as follows: "This matter has been considered by U.S. Magistrate Judge W. David King. It appears that the magistrate judge has filed his report. Written objections have been filed to the magistrate judge's report. The Court has considered *de novo* those portions of the report to which specific written objections are made; concludes that the report should be accepted in whole and incorporated by reference herein; and the Court being sufficiently advised; It is ORDERED that the defendants' motion to suppress evidence is DENIED." (J.A. at 148).

13. The district court's unusual step of referring the suppression issue to a magistrate *after* the district court listened to all of the testimony is another reason not to defer to the magistrate's

A careful analysis requires the court to examine individually the discrete items sought to be excluded.

### B. Position of the Government

The government bears the burden of proof in establishing the independent source and inevitable discovery doctrines. It relied solely upon the testimony of Agent Badaracco to establish such proof. Agent Badaracco admitted that after six months of investigation of the Indiana and Missouri enterprises, agents had no knowledge of Leake—and had not even uncovered the name "John Sandusky"—prior to the illegal search. Moreover, he conceded they had no knowledge of the U–Haul trip tying Leake to the conspiracy. He also admitted that the illegal search "streamlined" the investigation against Leake but insisted they would have discovered Leake's role in the conspiracy even without the illegally obtained evidence.

The government's argument thus rests upon the premise that agents would have uncovered the alias "John Sandusky" through utility records, would have used the cooperation of O'Daniel to connect the alias to Leake, and further would have induced O'Daniel to inform them of an otherwise unknown U–Haul trip.

According to the United States, the fact that O'Daniel—while sitting in federal prison in 1994 and being reminded of his duty to cooperate—linked Leake to the name "John Sandusky" and described the U–Haul trip proves that the government would have inev-

itably discovered such information absent any constitutional violation.

### C. Evidence Sought to Be Excluded

#### 1. Information from Joseph O'Daniel

■ For evidentiary purposes, information obtained from the prison visit with Joseph O'Daniel is fatally flawed. The record, although vague, leads to the inescapable conclusion that Badaracco asked O'Daniel about Leake and the U–Haul trip before O'Daniel volunteered any information.[14]

Such questions were impermissible. Badaracco's questions were based upon knowledge obtained as a result of the illegal search. He queried O'Daniel about Leake, his alias and the U–Haul trip—questions he could formulate only by virtue of illegally obtained evidence. The government may not use tainted evidence to induce production of competent evidence. Simply put, Badaracco cannot ask O'Daniel about "John Sandusky" and the U–Haul trip when the government knew of the alias and the trip through Robin.[15] Testimony from O'Daniel fails the test "whether, granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963).

Accordingly, we hold that Leake's involvement in the conspiracy cannot be proven with

findings of fact which were later summarily adopted by the district court. The magistrate was in the same position as this court, relying upon the transcript rather than an evaluation of live testimony. Because this court is equally capable of reading a record, it owes no particular deference to the magistrate's findings.

**14.** Badaracco testified that part of the purpose of the prison interview with O'Daniel was "to ask ... some questions regarding" the illegally obtained list linking Leake to the alias John Sandusky. (J.A. at 197). Further, the testimony indicates that O'Daniel did not volunteer information on the U–Haul rental until questioned about it; Badaracco testified, "We knew [the rental] was going to be an issue at this hearing and we wanted to be perfectly sure how that U-haul was rented and what information was generated from Mr. O'Daniel." (*Id.* at 216). Final-

ly, Badaracco confirmed that he "attempted to ask Mr. O'Daniel everything he remembered as part of his activities with Vince Leake and with others." (*Id.* at 222).

This testimony confirms that the government was attempting to use illegally obtained evidence to obtain admissible evidence—precisely the practice forbidden by the "fruit of the poisonous tree" doctrine.

**15.** Had Badaracco approached O'Daniel with open-ended inquiries about the conspiracy—with no reference to Leake or the U–Haul trip—and O'Daniel responded by implicating Leake, the government would have a stronger argument that the evidence would have been inevitably discovered. However, Badaracco's testimony bears no indication that this was the government's approach. *See* note 14, *supra.*

testimony or information obtained from Joseph O'Daniel. This is true of future as well as past testimony and information. The court can never know whether O'Daniel would have implicated Leake absent the questions grounded in illegally obtained evidence.[16] The government has failed to meet its burden of proof that any information from O'Daniel would have been inevitably discovered absent the illegal search. Future prosecution of Leake must proceed without information provided by O'Daniel.

### 2. Evidence Relating to "John Sandusky" and the Ewing Farm

Leake also seeks to suppress all evidence relating to the alias "John Sandusky" because the alias was not known to investigators until it was illegally obtained through Robin. The government argues that the independent source doctrine permits introduction of the evidence, as the name was discovered on utility records and on the registration of a vehicle on the Ewing, Missouri, farm.

 For reasons already set forth, information regarding "John Sandusky" cannot be introduced through O'Daniel or through information provided by Robin. Thus its admissibility depends on whether it was obtained legitimately through other means. Because the proffered other means involve the utility and vehicle registration records

obtained subsequent to a search of the Ewing, Missouri, farm, the government must prove that that farm was discovered via untainted evidence.

The government contends its June 1988 search of the Ewing farm was based upon information provided by Atkinson at his March 31, 1988, interview. (Government's brief at 8). However, a contemporaneous DEA report indicates—and Badaracco's testimony verifies—that Atkinson never mentioned Ewing during the March 31 interview. (See DEA Report appended to Docket 237). Badaracco testified Atkinson could not remember the exact location but described the farm as "very close to Quincy, Illinois." (J.A. at 173). It was through Robin's illegally obtained statement in April 1988 that investigators were pointed directly to Ewing, Missouri.

While it is conceivable that investigators might have worked their way to the Ewing farm and subpoenaed the records that revealed the name "John Sandusky" absent the information provided by Robin,[17] the government has failed to carry its burden of proof by way of "demonstrated historical facts capable of ready verification or impeachment." Nix, 467 U.S. at 444–45 n. 5, 104 S.Ct. at 2509 n. 5. All evidence related to the name "John Sandusky" and to the Ewing farm must be excluded.[18]

---

**16.** This is eminently clear with respect to the U-Haul incident. The government offers no explanation why O'Daniel, even while cooperating for his own sake, would have voluntarily disclosed another aspect of the conspiracy which occurred seven years previously and which investigators would have known nothing about.

**17.** It is true that the Indiana State Police report contained an address for the Ewing farm provided by the real estate agents in October 1987. However, the government in its brief did not claim to rely upon the ISP report to conduct the search or the subsequent subpoena; it claimed it "act[ed] on information received from Atkinson." (Appellee's brief at 8). Further, there is no explanation why, if the ISP report would have led them to the Ewing farm, it had not already done so by June 1988. The government cannot ask the court to speculate that it would have inevitably taken action it had not already taken in a reasonably timely manner.

Comparing the facts of this case to the facts of Nix is instructive. In Nix, the defendant

was illegally induced to lead police to the body of a girl he murdered. Evidence of the body was admissible under the inevitable discovery doctrine because a massive, foot-by-foot search being conducted by 200 volunteers was approaching the body. Because the prosecution established that the body "would have been discovered by lawful means," the evidence was admissible. Nix, 467 U.S. at 444, 104 S.Ct. at 2509 (emphasis added). Here the government is attempting to rely upon the fact that it became aware of the Ewing farm's address eight months earlier and that Atkinson described a farm near Quincy, Illinois. This is not sufficient to carry the burden that the government would have searched the Ewing farm and subpoenaed the utility and registration records.

**18.** Nor can the government now attempt to introduce evidence linking Leake to "John Sandusky" through some other as-yet undisclosed but purportedly legitimate channel. This case is brimming with loose ends, and the government might next try to argue that some other conspirator or

### 3. The U–Haul Receipt

Leake seeks to suppress the U–Haul receipt from his 1987 trip originally described by Robin. The United States argues it would have inevitably discovered the receipt from O'Daniel following his guilty plea had it not already known about the trip at that time. For reasons already set forth, information obtained in the interview with O'Daniel cannot be used as a basis of introducing the U–Haul receipt. Because no legitimate means for introduction of the receipt was proffered at the suppression hearing, the U–Haul receipt must be excluded.

### 4. Leake's Phone Records

Badaracco testified at the 1994 suppression hearing that phone records for Leake's residence had just been recently been subpoenaed and had not yet been received. An unmistakable inference is that the records were not subpoenaed until after the January 1994 prison interview with O'Daniel. For reasons we already have made clear, the phone records cannot be introduced through O'Daniel. Because no legitimate means for introduction of the phone records was proffered at the suppression hearing, the phone records must be excluded.[19]

### 5. Other Evidence

Leake further seeks exclusion of the following: a) evidence establishing a connection between himself and the Owen County, Indiana, farms; b) evidence establishing a connection between himself and the Missouri farms; [20] c) evidence obtained from Missouri real estate agents who were questioned by DEA agents; and d) evidence regarding Atkinson's debriefing on March 31, 1988.

Any evidence gathered by investigators prior to the illegal search of Leake's residence "has been discovered by means wholly independent of any constitutional violation." *Nix*, 467 U.S. at 443, 104 S.Ct. at 2508. This would include evidence arising from the debriefing of Atkinson and the statements of the Missouri real estate agents.

Leake's request to exclude evidence connecting him to the Indiana and Missouri farms is too broad for us to grant in the abstract. We have made clear what evidence is not admissible; we are not persuaded any competent evidence will remain to connect Leake to the farms; but we will not issue a flat mandate that no such evidence is admissible.

### D. Leake's Remedy

Leake pleaded guilty under Fed. R.Crim.Proc. 11(a)(2), which provides:

**Conditional Pleas.** With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. A defendant *who prevails on appeal* shall be allowed to withdraw the plea. (Emphasis added).

The plea agreement between Leake and the United States provided the following:

Should the Court of Appeals determine that the Motion to Suppress Evidence should have been sustained and that the United States cannot use in its case-in-chief the evidence identified in its respons-

---

clue connects Leake with the alias. However, any such evidence should have been presented during the suppression hearing in 1994, when Leake specifically challenged the link between Leake and his alias. The government failed to meet its burden that it would have established a link between Leake and his alias at that time. The government does not get an unlimited number of opportunities.

**19.** The United States argues that the phone records would have been inevitably discovered: "Upon learning of Leake's role in the organization, whether from O'Daniel, from Sapp, or from

another source, the United States immediately would have subpoenaed Leake's phone records." (Brief of United States at 27). This assertion conflicts with the United States' prior assertion, without detail, that Sapp already has implicated Leake. Assuming Sapp has done so, the United States did not "immediately" subpoena the phone records, as it claims.

**20.** We held in Section C.2 *supra* that no evidence connecting Leake to the Ewing farm can be admitted. The balance of his motion will be considered to regard the Paris, Missouri, farm.

es to the Motion to Suppress, then, and only in that event, will the defendant be allowed to withdraw the plea entered under this agreement.

The federal rule and the terms of the plea agreement make clear the implications on the conditional plea if the defendant is fully successful on appeal. The question not addressed is the effect of a *partially* successful appeal. This Court has determined that Leake's motion to suppress should have been granted in part and denied in part. The parties have not cited, and this court has not discovered, any authority on whether partial success on appeal is sufficient to allow a defendant to withdraw a guilty plea.

Leake's appeal resulted in the exclusion of the testimony of Joseph O'Daniel, information connecting Leake to the alias "John Sandusky," and evidence of the U–Haul receipt. Leake has thus been successful in excluding what appears to be the most damning evidence against him. Under these facts, we hold that Leake has "prevail[ed]," to use the language of Rule 11(a)(2), and is entitled to withdraw his plea.[21]

### E. Disposition Upon Remand

A motion to suppress based upon the fruit of the poisonous tree doctrine poses a procedural problem arising from the government's limited duty to disclose under the provisions of Fed.R.Crim.Proc. 16. For example, the government has no duty to identify witnesses or their anticipated testimony. Nonetheless, Rule 12(b)(3) requires a defendant to file motions to suppress prior to trial.

In this case Leake's counsel anticipated the problem of attempting to identify evidence not known to the defense by filing a motion which sought disclosure of all evidence the government intended to offer in support of the conspiracy counts of the indictment. Specifically, the motion requested the following:

1. An order compelling the government to provide an inventory of all physical evidence that it intended to use in its case in chief so the defendant could raise Rule 12(b)(3) objections to the same;

2. An order compelling the government to furnish the source of all evidence that may be identified as untainted;

3. A hearing for purposes of determining whether the subject evidence was derived from an untainted source; and

4. An order suppressing all tainted evidence, including evidence suppressible under the fruit of the poisonous tree doctrine.

(J.A. at 134). The government responded in considerable detail but did not make a complete disclosure. For instance, the response included a section titled "Other Evidence" which stated:

> The United States, of course, will introduce other evidence against Charles Leake. For example, co-conspirators not appearing on [Robin] Grimes' list likely will testify. Clearly, the United States did not discover their existence as a result of the unconstitutional search. Likewise, they were not motivated to plead and cooperate by evidence seized during that search. No evidence seized during that search implicated these co-conspirators in any way. Accordingly, their testimony is admissible.

> The United States will also introduce the phone records of Leake, O'Daniel and others. The United States would have subpoenaed O'Daniel's phone records upon learning of his role as leader of the organization. The United States learned of this information primarily through Atkinson. Accordingly, the United States would have obtained these records totally independent of the Leake search.

> The United States subpoenaed Leake's phone records upon learning of his role in the organization. The United States would have discovered that role regardless of the search. Upon learning of Leake's role in the organization, whether from O'Daniel or from another source, the United States immediately would have subpoe-

---

**21.** We do not mean to imply that every time a defendant manages to exclude any evidence on appeal following a conditional plea of guilty, he is entitled to withdraw his plea. The inquiry requires an examination of the degree of success and the probability that the excluded evidence would have had a material effect on the defendant's decision to plead guilty.

naed Leake's phone records. To exclude the phone records would place the United States in a worse position than if the search had not occurred. The Court should admit these records. (Docket 229).

The issue arising with the reversal and remand is whether the government, by filing a new notice of the evidence it intends to introduce, can compel the defendant to file another motion to suppress on the basis of the fruit of the poisonous tree doctrine, so as to preserve the government's right to an interlocutory appeal under the provisions of 18 U.S.C. § 3731.[22]

■ The Federal Rules of Criminal Procedure together with 18 U.S.C. § 3731 provide a balanced approach to the practical problems that arise in trial practice with respect to suppression motion practice in federal court. As indicated previously, motions to suppress must be made prior to trial. This rule recognizes that resolution of the motion frequently is case dispositive, as well as the fact that a pretrial ruling preserves the government's right to take an interlocutory appeal and avoid the impact of double jeopardy if the district court erred in granting the motion to suppress. Conversely, as in this case, following an adverse ruling on a motion to suppress and with the acquiescence of the government, a defendant may enter a conditional plea of guilty and preserve the right of appeal.

In this case, the government chose to limit its revelations as to the evidence it intended to use. It thus limited the opportunity of the defendant and the court to determine if the evidence and testimony was admissible in the context of the fruit of the poisonous tree doctrine.

In our view, it would be unfair to provide the government a second chance to require the defendant to test the admissibility of the government's evidence by a Rule 12(b)(3) motion to suppress. The government had a full opportunity to make its case at the first suppression hearing. Allowing another round of suppression motions would add even more life to this case arising from events occurring in 1987 and 1988. The court and the parties have legitimate interests in closure which are best served by this case proceeding to trial.

In holding that the defendant cannot be forced to file a second motion to suppress on the basis of the fruit of the poisonous tree doctrine, we recognize that the trial may be protracted. The district court will be required to allow the defendant to contest evidence during the trial not previously disclosed. We leave it to the district court to develop a method for resolving issues related to undisclosed evidence. It may be that the trial of the defendant will result in another appeal. Based on the record in that case, this court may be in a better position, in the exercise of its supervisory powers, to establish an orderly procedure to adjudicate the handling of a motion to suppress based on the claim that the evidence being offered is fruit of the poisonous tree.[23]

## VI. CONCLUSION

For reasons stated above, the motion to suppress should have been granted as to all testimony or information implicating Leake provided by Joseph O'Daniel. This would require suppression as well of the U–Haul receipt and Leake's phone records because the United States has provided no alternate legal way of introducing such evidence.

The motion also should have been granted as to evidence connecting Leake to the alias "John Sandusky" and to the Ewing, Missouri, farm. At trial the United States may not introduce evidence regarding the alias or the Ewing farm.

---

22. 18 U.S.C. § 3731 provides in part as follows:
 An appeal by the United States shall lie to a court of appeals from a decision or order of a district court suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on indictment or information, if the United States attorney certifies to the district court that the appeal is not taken

for purpose of delay and that the evidence is a substantial part of a fact material in the proceeding.

23. The Federal Rules of Criminal Procedure, as presently written, fail to provide a clear road map for resolution of motions to suppress evidence when challenged as "fruit of the poisoned tree" where the government refuses to disclose prior to trial the identity of its witnesses.

The motion was properly denied as to evidence obtained prior to the illegal search of Leake's residence. This includes evidence obtained as a result of statements by Claude Atkinson and Missouri real estate agents.

The motion was properly denied as to Leake's blanket request to suppress all evidence establishing a connection between Leake and the Indiana and Missouri farms.

Our conclusion requires that the conviction based upon the conditional plea of guilty be set aside. The sentence shall be vacated and the case remanded to the district court with the understanding that Leake has the right to withdraw his guilty plea as to Count One of the indictment and proceed to trial without being required to file a future motion to suppress based on as-yet undisclosed evidence.