KAREN NELSON MOORE, Circuit ' Judge,
dissenting.
The majority’s decision today avoids exclusion of the evidence at issue by patching together elements of various established exceptions to the exclusionary rule and discounting the deterrent value of the rule’s application in this instance. The result is troubling and inconsistent with our prior Fourth Amendment jurisprudence. Because none of the established exceptions to the exclusionary rule apply and because there is meaningful and important deterrence to be gained by the evidence’s exclusion, I respectfully dissent.
I. INEVITABLE DISCOVERY, INDEPENDENT SOURCE, AND ATTENUATION
In support of its decision, the majority asserts that “the bank records at issue were in the Government’s possession entirely free of illegal taint.” Maj. Op. at 988. In making this argument, the majority blurs elements of three exceptions to the fruit-of-the-poisonous-tree doctrine: (1) inevitable discovery; (2) independent source; and (3) attenuation. None of these exceptions apply.
*992 Citing United States v. Alexander, 540 F.3d 494 (6th Cir.2008), the majority invokes the inevitable-discovery doctrine and accompanying principle that the exclusionary rule cannot be applied so as to make the government worse off than if the illegal search or seizure had not occurred. As recognized by the Supreme Court in Nix v. Williams, 467 U.S. 431, 443-44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the inevitable-discovery doctrine provides “an exception to the exclusionary rule for evidence ... that inevitably would have been discovered by lawful means,” United States v. Keszthelyi 308 F.3d 557, 573-74 (6th Cir.2002). However, by the government’s own admission, there is no indication that the connection between Fofana and Ousmane Diallo would have inevitably been made. See R. 55 (Pretrial Tr. at 6) (government acknowledging that, because of the passport, “law enforcement was able to put [] together” the fact that Fofana was the person who opened the accounts under the alias Ousmane Diallo and that it was “pure speculation” whether such connection would have been made otherwise). In fact, the government did not even raise the application of the inevitable-discovery doctrine on appeal. Without evidence that the connection between Fofana and Ousmane Diallo would have inevitably been made regardless of the illegal search, I cannot perceive how the majority concludes that exclusion of the bank records places the government in a worse position. To the contrary, exclusion in this instance returns the parties to the status quo prior to the illegal search.
The majority also alludes to the independent-source doctrine, emphasizing that the bank records were lawfully in the government’s possession prior to the illegal search. While the independent-source doctrine does provide that evidence need not be excluded “where a proper, independent search led to the evidence in question,” it is inapplicable here. United States v. Baldwin, 114 Fed.Appx. 675, 681 (6th Cir.2004) (unpublished opinion) (quoting United States v. Dice, 200 F.3d 978, 984 (6th Cir.2000)) (internal quotation marks omitted). The majority’s argument misses the proper focus of the analysis. The bank records, which bore the alias Ousmane Diallo, were meaningless as against Fofana until the discovery of the passports in Fofana’s possession established the connection between Fofana and the alias Ousmane Diallo. Thus, it matters not that the government had the bank records prior to the illegal search because the government would never have known to use those bank records in prosecuting Fofana if not for the illegal search. It is the establishment of the connection between Fofana and the alias Ousmane Dial-lo that is important for our analysis — not the prior legal possession of the bank records themselves. To make out an independent-source exception the government needed to demonstrate that it had knowledge of the connection between Fofana and Ousmane Diallo via an independent source.[1] The district court was correct in concluding that the government failed to carry its burden in this respect.
Finally, the government invokes the attenuation doctrine citing United States v. Crews, 445 U.S. 463, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980), and United States v. Ceccolini 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978). The Supreme Court has explained the attenuation doctrine as follows: ‘We need not hold that all evidence is ‘fruit of the poisonous tree’ simply *993 because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is ‘whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.’ ” Wong Sun v. United States, 371 U.S. 471, 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The Supreme Court has suggested three factors to guide the attenuation analysis: “the temporal proximity of the [illegality] and the emergence of the incriminating evidence at issue, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.” United States v. Williams, 615 F.3d 657, 669 (6th Cir.2010) (alterations in original omitted) (quoting Brovm v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)).
The cases that the majority cites in support of its attenuation argument are not analogous. The Supreme Court in Crews based its finding of attenuation on the fact that “the police’s knowledge of respondent’s identity and the victim’s independent recollections of him both antedated the unlawful arrest and were thus untainted by the constitutional violation.” 445 U.S. at 477, 100 S.Ct. 1244. In other words, the Supreme Court found that the identifying link connecting the defendant to the crime, ie., the witness’s independent knowledge, existed prior to and independent of the illegality. Although the police had knowledge of the bank records’ existence prior to the illegality, as the police in Creivs had knowledge of the “respondent’s identity,” the police did not have knowledge of the link between Fofana and the alias. The link between Fofana and the alias is the identifying link crucial to the Crews holding: “the victim’s independent recollections” connecting the respondent to the crime. As a result, the illegal search at issue here, as opposed to that in Crews, did provide something “of evidentiary value that the police did not already have in their grasp” by “link[ing] together two extant ingredients in [the] identification”— Fofana and the alias Ousmane Diallo. Id. at 475, 100 S.Ct. 1244.
In Ceccolini, the Supreme Court concluded that witness testimony given as “an act of ... free will” after “[substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness ... and the testimony at trial” was sufficiently attenuated. 435 U.S. at 279, 98 S.Ct. 1054. The present case involves physical evidence rather than witness testimony and, therefore, excludes the possibility that free will could remove the taint. See United States v. Abridge, 346 F.3d 618, 633-34 (6th Cir.2003) (Moore, J., dissenting) (listing five considerations informing the Supreme Court’s inquiry in Ceccolini and identifying the element of free will as the most important). The bank records in question, unlike the testifying witness in Ceccolini, have no independent identifying ability and, therefore, are unable to bridge the connection between Fofana and Ousmane Diallo apart from the taint of the illegal search. In addition, there was not a significant lapse in time between the illegal search and use of information gained by the illegal search. The illegal search occurred in November 2007 and U.S. Bank filed the Suspicious Activity Report implicating Fofana less than three months later. R. 46 (Suspicious Activity Report at 4).[2] *994 In short, there is no attenuation to purge the taint between the illegal search and the identification of Fofana as synonymous with Ousmane Diallo. It is clear that the illegal search has been exploited in order to marshal the bank records in the government’s possession against Fofana.
II. DETERRENCE AND SOCIAL COSTS
The majority’s final three arguments relate to deterrence and the attendant social costs of exclusion. Specifically, the majority argues that: (1) exclusion would serve only minimal deterrent value because the illegal search was not conducted for the purpose of uncovering the evidence at issue; (2) exclusion of the bank records provides only minimal incremental deterrence because the passports have already been excluded; and (3) exclusion would burden the truth-seeking function of the courts. I disagree.
First, the majority states that the evidence should not be excluded because “the focus of the airport search was in no way related to the usefulness of the information obtained to the bank fraud prosecution” and, therefore, the “deterrent effect of excluding the evidence is ... minimal.” This statement is simply inaccurate. Maj. Op. at 989. By the Transportation Security Administration (“TSA”) agent’s own admission, the purpose of the illegal search was to uncover contraband. R. 26 (Suppression Hr’g Tr. at 97). Thus, while we do not know precisely what the agent expected (or hoped) to find, we do know that the agent’s searching activities were aimed at implicating Fofana in criminal wrongdoing. By finding the passports connecting Fofana to Ousmane Diallo, the agent succeeded in this aim regardless of whether the agent specifically foresaw and intended this exact result.[3] Allowing successful prosecution based on the fruits of this search creates incentives for agents to engage in similar conduct in the future.
Moreover, the circumstances of this search are sufficiently distinguishable from those in Ceccolini. In Ceccolini, the officer observed an envelope with incriminating evidence while in a flower shop “spending his short break engaged in conversation with his friend Lois Hennessey.” 435 U.S. at 270, 98 S.Ct. 1054. Given the incidental, casual encounter in Ceccolini between the officer and his friend, the flower shop employee, it is easy to see how the Court was confident that there was no future misconduct to deter. In contrast, the search in question occurred in conjunction with an administrative TSA search, to which TSA reports approximately two million travelers are subjected each day.[4] Given the broad discretion already granted to TSA agents to search the traveling public, it is important to deter unconstitutional conduct and to ensure that TSA’s broad powers are not improperly exploited for law-enforcement purposes. Suppressing the bank records serves this precise deterrent purpose.
*995 Second, the majority states that because the passports have been suppressed, suppression of the bank records will achieve only minimal incremental deterrence. I disagree. Although suppression of the passports has some deterrent effect, it is not enough given the significant benefit in using the information obtained from the passports to pursue the bank-fraud prosecution. In fact, in light of the usefulness of the information obtained from the illegal search, the government may view the suppression of the passports as a worthwhile sacrifice. Particularly in the context of airport administrative searches, it is important to maintain an incentive structure that does not encourage illegal behavior by ultimately permitting law enforcement to utilize evidence obtained as a result of misconduct in aid of significant prosecutions.[5] Suppressing the bank records achieves precisely this deterrent effect.
Third, the majority argues that the bank records should not be excluded because doing so “would burden the truth-seeking function of the courts.” Maj. Op. at 990. In support, the majority presents a kidnaping hypothetical and admonishes the use of the exclusionary rule to “force ... a Hobson’s choice.” Id. This argument overlooks a crucial reality of this case: The government was in no way forced into a Hobson’s choice. The government could have structured its investigation to insulate the admissibility of the bank records as against Fofana via the various established exceptions to the fruit-of-the-poisonous-tree doctrine. After learning of the connection between Fofana and Ousmane Diallo, the government could have pursued an independent investigation to procure this connection via an independent source. See Wong Sun, 371 U.S. at 487, 88 S.Ct. 407. This is in fact more or less what occurred in United States v. Watson, 950 F.2d 505 (8th Cir.1991), which the majority cites favorably in support of its position.[6] In the alternative, had the government wished to avoid exerting investigatory resources, under established Sixth Circuit precedent, it could have simply asserted its typical processes for investigating bank fraud to demonstrate that it would have inevitably discovered the connection between Fofana and Ousmane Diallo. See Keszthelyi, 308 F.3d at 574 (“The govern *996 ment can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence.”) (internal quotation marks omitted).[7] The government, however, did not make either effort and instead asks this court to sanction its inaction by allowing it to rely on the illegality for the evidence’s admission. The Fourth Amendment requires more. With an array of established exceptions providing the government with safety valves to the exclusionary rule’s application, it is not only unnecessary but also improper to indulge the government’s request.
The conclusion that the majority reaches today is inconsistent with our prior decision in United States v. Leake, 95 F.3d 409, 417-18 (6th Cir.1996), in which this Circuit suppressed evidence discovered pursuant to an illegal search that provided the necessary connection between the defendant and an alias. In Leake, an independent investigation by the Drug Enforcement Agency (“DEA”) had been initiated prior to an illegal search of Leake’s home by Kentucky police officers. As a result of the illegal search, the police officers were able to contact Leake’s girlfriend, who provided a list of information, which included the fact that Leake’s alias was “John Sandusky.” Id. Subsequent investigation by the DEA utilizing information resulting from the illegal search led to utility, and vehicle registration records in the name of John Sandusky that linked Leake to the conspiracy previously under investigation. Id. at 414. Although the government admitted that the list provided by the girlfriend that contained the alias was inadmissible, id. at 415 n. 9, it argued that other evidence thereby derived was admissible pursuant to the inevitable-discovery or independent-source doctrines, id. at 417. The court held that all evidence “connecting Leake to the alias ‘John Sandusky ” must be suppressed, id. at 421, noting that “[wjhile it is conceivable that investigators might have worked their way” to the evidence relating to the alias John Sandusky, “the government has failed to carry its burden of proof’ in this regard, id. at 418 (citing Nix, 467 U.S. at 444-45, 104 S.Ct. 2501). I find it is difficult to square the careful exclusion of the alias evidence and the various connections it facilitated to other incriminating evidence in Leake with the majority’s holding today. There was no evidence linking Fofana to Ousmane Dial-lo prior to the illegal search, and the government made no effort to demonstrate its ability to establish this link independent of the illegality. Just like Leake, this is a case “brimming with lose ends.” Id. at 418 n. 18.
Had the government taken simple, independent investigatory steps to solidify its case against Fofana we would be deciding a very different case today. In fact, we would very likely have a case in which we could unanimously agree that at least one of the established exceptions to the fruit-of-the-poisonous-tree doctrine applied. However, such is not the case before us. As Justice Stevens so aptly stated in Nix v. Williams:
“The majority refers to the ‘societal cost’ of excluding probative evidence. In my *997 view, the more relevant cost is that imposed on society by police officers who decide to take procedural shortcuts instead of complying with the law.”
Nix, 467 U.S. at 457, 104 S.Ct. 2501 (Stevens, J., concurring) (citation omitted). While it is often the unhappy result of the exclusionary rule that those who are culpable go free, this is the cost of ensuring meaningful protection of important constitutional rights. See Mapp v. Ohio, 367 U.S. 643, 659, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (“The criminal goes free, if he must, but it is the law that sets him free. Nothing can destroy a government more quickly than its failure to observe its own laws, or worse, its disregard of the character of its own existence.”). I cannot condone the government’s brazen disregard of the Fourth Amendment in this instance. Doing so is inconsistent with prior precedent and diminishes the importance of constitutional liberties. Accordingly, I respectfully dissent.

. As with inevitable discovery, the government bears the burden of proving that such evidence was in fact available via an independent, untainted source. United States v. Leake, 95 F.3d 409, 412 (6th Cir.1996).

. Moreover, the majority's statement that “[i]t is only incidental that an illegal search speed-ed the recognition of the usefulness of the available evidence” confuses attenuation with inevitable discovery. Maj. Op. at 989.

. In this sense, this case is distinguishable from United States v. Abridge, 346 F.3d 618, 628 (6th Cir.2003). In that case, the "officers were responding to a complaint about drug trafficking from Akridge’s apartment” and "not specifically in search of the particular evidence sought to be suppressed in this case, i.e., witness testimony.” Id. Moreover, in Abridge, this Circuit recognized that “a clear intent to uncover illegality through illegal means would seem to weigh in favor of suppression.” Id.

. Transportation Security Administration, TSA Myth or Fact: Leaked Images, Handcuffed Hosts, Religious Garb, and More!, The Tsa Blog (Nov. 18, 2010), http://blog.tsa.gov/2010/ 11/tsa-myth-or-fact-leaked-images.html (last visited Jan. 18, 2012).

. Moreover, the cases the majority cites as supporting its position are distinguishable. Each case involved the use of evidence obtained via illegal means in support of charges lodged in response to criminal activity undertaken after the illegal search or seizure took place — not in support of charges lodged as a result of knowledge obtained pursuant to the illegal search or seizure about previous criminal wrongdoing. See United States v. Awadallah, 349 F.3d 42, 73-75 (2d Cir.2003) (admitting false statements to grand jury obtained in conjunction with an illegal detention in aid of perjury charges lodged after the false grand jury testimony because "it is untenable to say that the FBI agents ... sought to elicit perjury rather than truthful information”); United States v. Varela, 968 F.2d 259, 260, 262 (2d Cir.1992) (holding that the exclusionary rule does not bar "the use of unlawfully obtained post-arrest statements ... to prove that [a defendant] subsequently committed” perjury where the perjury occurred after the “unlawful arrest or seizure ... instead of preceding it”). United States v. Paepke, 550 F.2d 385, 389-91 (7th Cir.1977) (upholding the use of evidence previously deemed inadmissible in a narcotics prosecution where it was relevant to a tax-fraud charge arising from conduct occurring after the narcotics charges were dismissed).

. In this regard Watson is distinguishable from the present case. In Watson, the key factor to the Eighth Circuit’s holding was that a "subsequent, separate investigation” initiated after acquisition of the evidence rendered said evidence "sufficiently attenuated from the presumably illegal search so as to purge the evidence of any possible taint.” 950 F.2d at 507. The government has presented no evidence of a similar subsequent and separate investigation in this case.

. Such an approach would work equally well in the government’s depraved-kidnapper scenario because the government need not continue the expensive city-wide manhunt so long as it could demonstrate that its investigatory procedures would have eventually procured the same result. See Nix, 467 U.S. at 449-50, 104 S.Ct. 2501. In the alternative, were the kidnaping victim still alive, the victim’s ability to testify by virtue of his or her own free will as to the kidnapper’s identity would seem sufficient to attenuate the taint of the initial illegality per Ceccoiini.