**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Donald G. FORD (97–6097/6270); Sandra Hutchins Ford (97–6271), Defendants–Appellants.**

**Nos. 97–6097, 97–6270 and 97–6271.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 29, 1998.

Decided July 23, 1999.

Rehearing and Suggestion for Rehearing En Banc Denied Oct. 8, 1999.

Terry M. Cushing (argued and briefed), Alexander T. Taft, Jr. (briefed), Michael R. Mazzoli (briefed), Asst. U.S. Attorneys, Office of the U.S. Attorney, Louisville, KY, for Plaintiff–Appellee.

Robert C. Webb (briefed), Brown, Todd & Heyburn, Louisville, KY, Alan M. Dershowitz (argued and briefed), Harvard Law School, Cambridge, MA, C. Fred Partin (briefed), Louisville, KY, for Defendants–Appellants.

Before: NELSON, CLAY, and John R. GIBSON,* Circuit Judges.

## OPINION

JOHN R. GIBSON, Circuit Judge.

Don Ford and his wife, Sandra Hutchins Ford,[1] appeal their convictions for operation of an illegal gambling business, 18 U.S.C. § 1955 (1994), and money laundering, 18 U.S.C. §§ 1957 (1994) (both defendants) and 1956(a)(1)(B)(1994) (Ford only). Ford also appeals his conviction under 26 U.S.C. § 7206(1) (1994) for filing a false income tax return. Both raise numerous claims of error in denying various motions and in sentencing. Ford and Hutchins raise Fourth Amendment issues concerning the search of Ford's bingo hall and another building. They also contend that the district court erroneously determined that there were no permissible bases for departure from the Guidelines sentencing range. We reverse Ford's tax conviction because it is based on evidence that was seized in violation of his Fourth Amendment rights. We affirm Ford's and Hutchins's gambling and money laundering convictions, but remand Ford's case for

---

* The Honorable John R. Gibson, Circuit Judge of the United States Court of Appeals for the Eighth Circuit, sitting by designation.

1. The Fords married after the crimes in this case were committed. To make it easier to distinguish between the defendants, we will refer to Sandra Hutchins Ford as Hutchins, which was her name at the time of the events in question.

resentencing in light of the reversal of his tax conviction.

Don Ford owned and operated the Arcade Bingo Plaza, which was in the business of conducting bingo games for the benefit of charities. Under Kentucky law, it is illegal to promote gambling (which includes bingo) other than "charitable gaming" subject to complex rules that were amended twice during the time periods relevant to this case. *See* Ky.Rev. Stat. Ann. §§ 528.010(10) (Michie 1985); 1990 Ky.Rev.Stat. and R. Serv. ch. 469 (Banks–Baldwin) (effective July 13, 1990); 1992 Ky.Rev.Stat. and R. Serv. ch. 461(Banks–Baldwin) (effective April 13, 1992). Throughout the time in question, gambling could only be legal "charitable gaming" if it was operated by a tax exempt organization; if that organization had maintained tax exempt status for five years before the gaming; if the gaming was conducted exclusively by unpaid volunteers for the charity; and if the proceeds were used solely for the charitable purposes of the organization. During various times there were many other requirements for the conduct of charitable gaming, including a limitation of $5,000 per day in prizes and limitations on the number of days and hours per week the organization could conduct gaming.

Ford first operated the Arcade Bingo Plaza in Louisville, Kentucky in 1990, conducting bingo games for various charities, such as the Knights of Columbus. Ford would charge the charities rental and overhead for use of the hall. Hutchins was Ford's second in command at the Arcade Plaza, and when he was not there she conducted the business. Instead of using volunteers from the sponsoring charities to run the bingo games in accordance with Kentucky law, Ford hired workers. The workers were paid from money "cut" or "skimmed" from the bingo proceeds. The skim was made by the controller for the session, then given to Hutchins. The workers were paid in cash, often surreptitiously handed to them in a handshake.

The amount of money skimmed varied with the size of the crowd, because the more players there were, the larger the amount that could be skimmed without the players detecting the diminution of the prize money. Sometimes there was cash left over from the skim after the workers were paid; this money would be put in the safe in "Mr. Ford's compartment."

In November 1990 Ford sold the Arcade Plaza to his employee Clay Ballinger, for $1 down and $249,999 in credit. Ford had no further role in the operation of the bingo hall, except to collect payments from Ballinger, until the end of 1991.

At that time Ford came up with the idea of controlling his own charitable sponsor. Ford bought the Arcade Plaza back from Ballinger. Ford reactivated a lapsed post of the Regular Veterans Association on December 16, 1991. Later, he registered several other RVA Posts and suborganizations. Because of the statutory limitations on the number of sessions one organization could sponsor and the amount of prize money an organization could award in one day, once the limits had been reached for one RVA sponsor, Ford would substitute another RVA sponsor. At a Christmas party for the Arcade workers in 1991, Ford told the workers that the RVA was going to sponsor bingo games at the Arcade Plaza. The workers testified that Ford expected them to join the RVA in order to work at the Arcade Plaza. Bingo patrons at the hall were invited to join the RVA, and the RVA subsidized their $5 dues with a bingo pass worth $5.

Ford made himself treasurer and Sandra Hutchins secretary of the RVA entities he controlled. Ford and Hutchins were the signatories on the various RVA bank accounts. The other officers were Ford's employees or long-time associates who had virtually no knowledge of the RVA posts' operation or function. For instance, Clay Ballinger was president of one post, although he couldn't say which. He testified at trial, "To this day, I really can't tell you what RVA is." Roy Bunch, president of

RVA Post No. 1, stated: "I was President of the club, but I had no position ... Well, I had no authority, let's put it that way."

After the RVAs began sponsoring bingo at the Arcade Plaza, the method of paying non-RVA charitable sponsors changed. Rather than the old system of paying the sponsors the net proceeds, Ford and Hutchins began paying a flat fee of $500 in the form of a check and $500 cash "discreetly" handed to the sponsor's representative. The result of the new system was that the non-RVA sponsors made less and the Arcade Plaza kept more of the proceeds. In addition, Ford began giving the RVA the proceeds of the pull-tab games sold by vendors on the bingo floor during other sponsors' sessions.

After Kentucky law was changed in April 1992 to forbid the award of more than $5,000 in prizes in one day, 1992 Ky.Rev.Stat. and R. Serv. ch. 461, Hutchins altered Arcade Plaza records to eliminate any record of prizes exceeding the $5,000 limit.

After police executed a search warrant on the Arcade Bingo Plaza and the RVA Hall across the street, Ford and Hutchins were indicted on two counts of operating a gambling business in violation of state law, 18 U.S.C. § 1955. Ford was also indicted on twenty-eight counts of engaging in monetary transactions in criminally derived property for transactions involving gambling proceeds, 18 U.S.C. § 1957; three counts of engaging in transactions undertaken to disguise the nature, location, source, ownership or control of criminally derived money, 18 U.S.C. § 1956(a)(1)(B)(i) and (ii); and one forfeiture count. Hutchins was indicted on two counts of engaging in monetary transactions with criminally derived proceeds, 18 U.S.C. § 1957, and one forfeiture count. (Offenses under both section 1956 and section 1957 are referred to as "money laundering" offenses.)

Ford was also indicted in a separate case of eleven counts of tax offenses completely unrelated to the bingo operation.

During the search of the RVA Hall at 2902 South Seventh Street Road, across from the Arcade Plaza, police seized documents that had no relation to the bingo operation, including files from 1984 to 1988 relating to a real estate transaction known as the "Huber's deal." In the Huber's deal, Ford had sold land to Huber's, Incorporated for $1.5 million, in the form of $400,000 down and a note for $1.1 million. Ford sold the $1.1 million note to his accountant for $800,000 and took a $300,000 loss from the sale transaction on his 1986 income tax. The accountant paid Ford for the note with the proceeds of a bank loan; simultaneously, Ford used the $800,000 to purchase a certificate of deposit which Ford pledged to secure the accountant's bank loan. When Huber's paid the $800,000, the accountant paid off the loan and the bank released its lien on Ford's certificate of deposit. The accountant then assigned the Huber's, Inc. note back to Ford, who eventually received the remaining $330,969.33 payment from Huber's, Inc. in 1988. Ford did not report that payment as income on his 1988 tax return.

After a jury trial on the gambling and money laundering charges, Ford was convicted of both gambling counts, twenty-six counts of section 1957 money laundering and one count of section 1956 money laundering. Hutchins was convicted of one of the gambling counts and two counts of section 1957 money laundering. In the separately tried tax case, Ford was convicted of one count of filing a false income tax return, 26 U.S.C. § 7206(1), for failing to report income on his 1988 return.

Ford was sentenced to twenty months' imprisonment in the tax case, and 108 months in the gambling and money laundering case, to be served concurrently with each other. Hutchins was sentenced to forty-one months' imprisonment. Both appeal from their convictions and their sentences.

## I.

■ Ford contends that the search of his buildings violated his Fourth Amend-

ment rights because the warrant was not sufficiently particular and because federal agents improperly took advantage of a search conducted under a state warrant.

Louisville Police Department officers conducted the search under a state warrant based on an affidavit. Three IRS agents also assisted in executing the warrants. The affidavit supporting the warrant described the Louisville Police Department's investigation of Donald Ford's bingo operations. Police had visited the Arcade Bingo Plaza building, where Donald Ford and his subordinates Sandra Hutchins and Clay Ballinger conducted bingo games, which they claimed were for the benefit of charities. The affidavit described numerous violations of the statutory requirements for charitable gaming, such as payment of the "volunteer" workers, payment of prizes exceeding $5,000 per day, and operation of bingo games supposedly sponsored by charities that had no representatives present during the game. The affidavit also stated facts indicating that the RVA sponsors were actually shells having no charitable or fraternal function, but existing only as alter egos of Donald Ford. The affiant recited facts that would support an inference that Hutchins and Ballinger had taken home the proceeds from the bingo games, and that Ford kept numerous lock boxes at various banks containing cash.

The warrant contained ten clauses listing items to be seized. Some of the clauses were expressly limited by reference to illegal gambling or bingo. However, some clauses had no such limitation, in particular the category authorizing seizure of: "Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and cash checks, money wrappers, passbooks, bank checks, automatic teller machine receipts, Western Union receipts, safety deposit box keys, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer,

concealment and or expenditure of money."

The police executing the warrant seized several file cabinets and eleven boxes of documents. The officer in charge testified at the suppression hearing that they seized "basically most of the documents" at 2902 South Seventh. Another officer agreed that they "pretty much took everything." Many of the documents related to Ford Industries and Durrett Investigations, auto-financing and private investigation businesses, respectively, also owned by Ford. Among the documents seized were promissory notes, deeds, and related papers, all dated between 1984 and 1988, concerning the Huber's deal, which was completely unrelated to the gambling operation.

The search took place in the late night and early morning of August 28 and 29, 1992. The documents seized were kept at the Louisville Police headquarters until September 23, when they were transferred to the IRS offices. In November 1992, the IRS officially obtained custody of the documents by grand jury subpoena.

### A.

The tax prosecution was based on documents seized in the August 28–29 search. Ford moved to suppress the documents on the grounds that if the documents were within the scope of the search warrant, the search warrant was overbroad, and if the search warrant was read narrowly enough to be valid, the documents were not within its scope. The government did not contend that the warrant should be narrowed by construction, see Andresen v. Maryland, 427 U.S. 463, 480–81, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976), and therefore limited to documents related to bingo. Instead, the government contended that it needed all Ford's financial documents in order to determine his "overall financial picture" and thus establish what money he had available, where the money came from, and what happened to it. This could require law enforcement officials to go

back "ten years or more." Therefore, according to the government, the warrant properly permitted seizure of all financial documents in the buildings, whether or not related to the bingo operations in time or subject matter.

The magistrate judge recommended that the warrant be held valid "in view of the complex nature of the investigation, the pervasive presence of fraud, and the inability of the investigating officers to determine more specifically what items would be subject to seizure."[2] The district court conducted a de novo review and held that the affidavit on which the warrant was based "implicitly established" that Ford's organization was "permeated with fraud" and that the warrant was therefore not overbroad, citing *United States v. Oloyede*, 982 F.2d 133, 141 (4th Cir.1993).

■ We review de novo the district court's conclusion on the overbreadth issue. *United States v. Durk*, 149 F.3d 464, 465 (6th Cir.1998) (deciding whether description of premises was overbroad); *Davis v. Gracey*, 111 F.3d 1472, 1478 (10th Cir.1997) (deciding whether description of items to be seized was overbroad).

■ The Fourth Amendment guarantees that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly* describing the place to be searched, and the persons or things to be seized." (Emphasis added.) The particularity requirement prohibits the issuance of warrants that would let officers seize "one thing under a warrant describing another." *Davis*, 111 F.3d at 1478 (quoting *Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927)). "A general order to explore and rummage through a person's belongings is not permitted." *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir.) (quotation omitted), *cert. denied*, 502 U.S. 1008, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991).

■ The degree of specificity required in a warrant depends on what information is reasonably available to the police in the case. *Id.* at 1027. A general description may suffice when the police could supply no better information, but fail when a narrower description was available. *Id.* In particular, when the suspect himself has made it difficult to describe particularly the items to be seized, a broad warrant is permissible. *See United States v. Bentley*, 825 F.2d 1104, 1110 (7th Cir.) (criminal enterprise does not get extra protection from the Fourth Amendment by choosing a form of operation that generates huge amounts of paper), *cert. denied*, 484 U.S. 901, 108 S.Ct. 240, 98 L.Ed.2d 198 (1987); *United States v. London*, 66 F.3d 1227, 1238 (1st Cir.1995) (general search permitted where suspect had mingled legitimate business documents with documents probative of crime), *cert. denied*, 517 U.S. 1155, 116 S.Ct. 1542, 134 L.Ed.2d 646 (1996).

We have recently upheld a warrant containing a paragraph identical to the broadest language in the warrant before us ("Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashier's checks, money wrappers, passbooks, bank checks, automatic teller machine receipts, Western Union receipts, safety deposit box keys, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money"). In *United States v. Ables*, 167 F.3d 1021 (6th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 2378, —— L.Ed.2d —— (1999), another Louisville bingo hall search case, we held that the language quoted above did not authorize a general search. *Id.* at 1033–34. Notably, there was no suggestion in *Ables* that the warrant was used to seize documents that

---

**2.** The magistrate did identify three clauses that contained no limitation either to gambling or money as "arguably" overbroad;

however, no evidence was seized under those clauses, so there was nothing to suppress.

could not have pertained to bingo proceeds.

■ However, in this case, the quoted language authorized a broader search than was reasonable given the facts in the affidavit supporting the warrant. The affidavit stated that the first of Ford's RVA posts was incorporated in December 1991, and there was no indication in the affidavit of criminal activity before that date. The affidavit described an investigation beginning on April 24, 1992. It also reported an interview with Clay Ballinger, who said he had operated the bingo himself but had "sold the Arcade Plaza Bingo back to Mr. Ford in 1991." However, the police seized promissory notes, deeds, and related papers dated between 1984 and 1988, which had no relation to the bingo operation. In *Blakeney* a warrant authorizing a search for "jewelry" was overbroad because the agent applying for the search warrant had available an inventory of the specific items of jewelry that had been stolen. 942 F.2d at 1027. Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad. *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir.1982); *United States v. Abrams*, 615 F.2d 541, 545 (1st Cir.1980)("A time frame should also have been incorporated into the warrant."); *In re Application of Lafayette Academy*, 610 F.2d 1, 6 (1st Cir.1979). We have held as much in an unpublished case. *United States v. Nagalingam*, No. 97–6433, 1998 WL 739822, at *3 (6th Cir. 1998); *see also United States v. Sissler*, No. 91–2113, 1992 WL 126974, at *6–7 (6th Cir.1992), *cert. denied*, 506 U.S. 1079, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993).

The government argues that it was necessary to seize documents antedating the bingo operation to establish what money Ford had before the bingo business started. This would help the government to identify which of his present assets could be bingo proceeds. This argument would allow virtually unlimited seizure of a lifetime's worth of documentation, which is extremely intrusive. Moreover, the impracticability of tracing the origin of every dollar Ford owned to show whether it came from some enterprise other than bingo, casts doubt on whether the government really means to take on such a herculean task. At any rate, this rationale was not articulated in the affidavit, and therefore we need not decide whether it would have provided a justification for the warrant if it had been presented to the magistrate. *See Lafayette Academy*, 610 F.2d at 6 n. 9 (rejecting justification for the seizure of records predating offense as being unsupported in affidavit).

Similarly, we reject the government's argument that it seized the Huber's, Inc. documents because the storage of Ford's personal documents at the RVA Hall showed Ford and the RVA were alter egos. Again, this argument would allow an extreme intrusion for evidence of very little probative value. The government at trial used the documents for an entirely different purpose than simply to prove that they were stored at the RVA Hall.

■ The government further argues that there was probable cause to seize all the documents at the RVA Hall because the business carried on there was "permeated with fraud." Other circuits have upheld extremely broad warrants on such a theory. *E.g., United States v. Humphrey*, 104 F.3d 65, 69 (5th Cir.), *cert. denied*, 520 U.S. 1235, 117 S.Ct. 1833, 137 L.Ed.2d 1038 (1997); *Oloyede*, 982 F.2d at 140–41; *United States v. Sawyer*, 799 F.2d 1494,1508 (11th Cir.1986), *cert. denied*, 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987); *United States v. Kail*, 804 F.2d 441, 445 (8th Cir.1986); *United States v. Brien*, 617 F.2d 299, 309 (1st Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980). The affidavit definitely contained evidence that Ford was abusing the form of charitable organizations in order to run bingo games for personal profit. However, the affidavit did not disclose any reason to believe that the scheme began before December 1991, the

date given in the affidavit as the date when Ford reactivated his first RVA post. Even if one business carried on at a site is permeated with fraud, if other businesses run at the same site are separable and are not shown to be related to the suspected crime, a warrant permitting seizure of all documents at the site is not justified. *Voss v. Bergsgaard*, 774 F.2d 402, 406 (10th Cir.1985); *Bentley*, 825 F.2d at 1110. As in *Voss*, 774 F.2d at 405, the overbreadth of the warrant in this case is illustrated by the items actually seized under it—here, documents dating from years before the bingo operation began and which pertain to an entirely unrelated crime.

 The government argues that even if the warrant was overbroad, the documents relating to the Huber's, Inc. deal would inevitably have been discovered in the course of the IRS's pending civil investigation of Ford's 1988 tax return. Under the inevitable discovery doctrine, illegally seized evidence may be admitted despite the exclusionary rule if the government can prove that it would have obtained the evidence from lawful sources even if the illegal seizure never happened. *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir.1995), *cert. denied*, 517 U.S. 1119, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996). The government can prove this either by showing that "an independent, untainted investigation ... inevitably would have uncovered the same evidence or [by showing] other compelling facts establishing that the disputed evidence inevitably would have been discovered." *Id.* Application of this doctrine necessarily requires some speculation about what would have happened if events had unfolded differently than they did. *United States v. Leake*, 95 F.3d 409, 412 (6th Cir.1996). However, we must keep speculation at a minimum by focusing on "demonstrated historical facts capable of ready verification or impeachment." *Id.* (quoting *Nix v. Williams*, 467 U.S. 431, 444–45 n. 5, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984)). The

government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence. *Kennedy*, 61 F.3d at 500. However, if the defendant shows that the police were not in fact following those routine procedures in the particular case, the government's evidence about what police *would have done* must bow to contrary evidence about what they *actually did.* For instance, in *Leake*, 95 F.3d at 418 n. 17 and 418 n. 19, the government argued that police would inevitably have acted on certain leads. However, the evidence showed that the police did not in fact take action on those leads in a "reasonably timely manner," 95 F.3d at 418 n. 17, and therefore the court held that the government had not carried its burden of proving inevitable discovery.

 The district court's application of the inevitable discovery rule is a mixed question of fact and law which we review de novo. *Kennedy*, 61 F.3d at 497.

 In this case, before the illegal search took place, the IRS had issued a notice of deficiency to Ford for the 1988 tax year, based on his claimed net operating loss carryforward from 1986. Ford petitioned the United States Tax Court for relief on November 2, 1992, contending that the IRS had incorrectly disallowed the net operating loss carryforward. On December 28, 1992, the IRS filed an answer conceding the case: "[R]eview of taxpayer's records, not available to respondent's agent at the time notice was issued, has persuaded respondent that petitioners' 1988 return was substantially correct as filed."

At the suppression hearing, the government did not call William Shouse, the IRS attorney who had actually handled the tax court case. Instead, it called another IRS attorney, Jennifer Decker, who did not handle the Ford suit, and asked her what she would have done had she been handling the case. She testified about how

she would have tracked down the same documents that were illegally seized, obtaining them from IRS files and from Huber's, Inc., if Ford did not produce them. The district court credited this testimony in holding that the seized documents would have inevitably been discovered without the illegal search.

Here, the testimony about what the IRS would have done in investigating this case is inconsistent with what the IRS actually did—it conceded the correctness of Ford's position, undertook no discovery in the case, and ultimately entered an agreed dismissal of the case. As in *Leake*, the record does not substantiate the government's claim that it was hot on the trail of the disputed evidence. The government has not carried its burden of proving the inevitability of discovery.

We therefore hold that the documents seized from 2902 South Seventh Street Road pertaining to the Huber's deal, the sale of the Huber's note to the accountant and the accountant's reassignment of the note to Ford must be suppressed because they were seized in violation of Ford's Fourth Amendment rights.[3] Ford's tax conviction must be reversed.

### B.

■ Ford and Hutchins contend that the district court should have suppressed the evidence seized in the August 28–29 search in the gambling case as well as the tax case. They argue that since the warrant was overbroad, all the evidence seized under it should be suppressed. To the contrary, the remedy for an overbroad warrant is to sever the overbroad portions of the warrant from those portions that are sufficiently particular. *United States v. Blakeney*, 942 F.2d 1001, 1027 (6th Cir.), *cert. denied*, 502 U.S. 1008, 112 S.Ct. 646, 116 L.Ed.2d 663 (1991). The portions of the warrant limited to fruits and evidence of gambling are sufficiently particular; even though those portions do not contain a time limitation, their subject-matter limitation (fruits and evidence of gambling) fulfills the same function as a time limitation would have done, by limiting the warrant to evidence of the crimes described in the affidavit.[4] The portions of the warrant limited to fruits and evidence of bingo can be severed from the part of the warrant which is not so limited. Therefore, seizure of the documents pertaining to the gambling and the closely related money laundering charges was permissible.

■ In another argument related to the overbreadth issue, Ford and Hutchins argue that the search was invalid because federal agents "tagged along" with Louisville Police Department officers executing a state warrant. Citing *United States v. Sanchez*, 509 F.2d 886 (6th Cir.1975), Ford and Hutchins contend that the lack of a federal warrant invalidated the search. *Sanchez* does not prohibit federal officers

---

3. The government does not argue that the Huber's, Inc. documents should be admitted under the good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *United States v. Savoca*, 761 F.2d 292, 295–96 (6th Cir.), *cert. denied*, 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985). Even appellees waive arguments by failing to brief them. *See Thaddeus–X v. Blatter*, 175 F.3d 378, 403 at n. 18 (6th Cir.1999) (en banc).

4. The sentences under which the government justified seizure of the documents antedating gambling activities were the second and fourth clauses in the portion of the warrant describing property to be seized: "Books, records, receipts, bank statements and records,

money drafts, letters of credit, money orders and cashier's checks, money wrappers, passbooks, bank checks, automatic teller machine receipts, Western Union receipts, safety deposit box keys, and other items evidencing the obtaining, secreting, transfer, and/or concealment of assets and the obtaining, secreting, transfer, concealment and/or expenditure of money" and "Indicia of occupancy, residency, and/or ownership of the premises described above, including but not limited to, utility and telephone bills, canceled envelopes, and keys". Additionally, the magistrate stated that three other clauses were "arguably" overbroad, but that no property had been seized pursuant to those clauses. *Supra*, n. 3.

from being present during execution of a state warrant, *see generally United States v. Searp*, 586 F.2d 1117 (6th Cir.1978), *cert. denied*, 440 U.S. 921, 99 S.Ct. 1247, 59 L.Ed.2d 474 (1979), but only prevents officers from using a warrant describing one kind of evidence as a pretext for searching for evidence outside the warrant. In *Sanchez*, officers had a warrant to search for narcotics evidence, when they learned that there was also probable cause to search for explosives at the same house. Rather than obtain a warrant to search for explosives, they simply used the narcotics warrant to search for explosives. Since the explosives were outside the scope of the warrant, Sanchez moved to suppress the fruits of the warrantless search for the explosives. The government then claimed the explosives were in plain view during execution of the narcotics warrant and therefore could be seized even though they were outside the warrant. We rejected the plain view argument, holding that the explosives search was actually a "distinct intrusion" from the narcotics search. 509 F.2d at 889. We held that seizure of property unrelated to what was described in the warrant was exactly the harm that the Fourth Amendment's particularity clause was meant to prevent. *Id.* at 889–90. We therefore ordered the explosives suppressed. *Id.* at 890. We have just used similar reasoning to condemn the seizure of the Huber's, Inc. documents under a warrant based on an affidavit about illegal gambling. *Supra at* 575–78. However, in this case the gambling and money laundering documents were covered by the valid portions of the warrant, which we have held are separable from the invalid portions. The government is making no attempt to excuse a warrantless seizure by a plain-view argument. The gambling documents were not seized under a warrant describing something else; they were seized by state officers under a state warrant describing gambling documents. *Sanchez* therefore provides no authority for suppressing them.

## II.

Although we have already held that Ford's tax conviction must be reversed because evidence was admitted in violation of the exclusionary rule, we will address issues that are likely to arise in the event of retrial of the tax case. Ford argues that the district court erred in the tax case by refusing to give the reliance-on-advice-of-accountant instruction Ford proffered. The district court refused the instruction because there was no evidence that Ford relied on his accountant in deciding not to report the $330,969.93 in his 1988 return.

A court's refusal of a defendant's proffered instruction is reversible if the instruction is a correct statement of the law, not otherwise covered in the court's charge, and if the failure to give the instruction substantially impairs the defendant's defense. *United States v. Frost*, 125 F.3d 346, 372 (6th Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 40, 142 L.Ed.2d 32 (1998). A court should refuse a jury instruction if no evidence supports it, *United States v. Lindo*, 18 F.3d 353, 356 (6th Cir.1994), but even weak evidence will suffice. *Frost*, 125 F.3d at 372. A defendant is entitled to a reliance-on-advice instruction if he shows (1) he made full disclosure of all pertinent facts and (2) he relied in good faith on the advice. *Lindo*, 18 F.3d at 356. Specifically, we have held that a reliance-on-advice-of accountant instruction is warranted even without per se testimony that the defendant relied on the accountant's advice, so long as the circumstances support an inference that he did so rely. *United States v. Duncan*, 850 F.2d 1104, 1115–19 (6th Cir.1988).

Ford argues that the accountant structured the transaction in which Ford sold the note to the accountant, and since Ford effected the transaction as the accountant planned, he necessarily relied on the accountant's advice. Actually, Ford was simply convicted for failing to report the

$300,000, not for any other aspect of the transaction. The accountant testified that the plan as he formulated it was to delay Ford's receipt of the $300,000, but to report the $300,000 as income when received. Ford's failure to report the $300,000 was not part of the transaction planned by the accountant. The district court did not abuse its discretion in denying the reliance instruction.

### III.

■■■ Ford argues that the district court in the tax case did not afford him his full rights to disclosure of jurors' tax audit information under the former 26 U.S.C. § 6103(h)(5) (1994).[5] The district court ordered release of the venire list twelve days before trial so that Ford could request audit histories under the former section 6103(h)(5); Ford contends that this was not sufficiently in advance of trial to preserve his rights. To the contrary, the record shows that there was plenty of time for the IRS to supply the required information, which was made available four days after the release of the venire list and twelve days before jury selection. Under *United States v. Spine*, 945 F.2d 143, 148 (6th Cir.1991), a defendant was entitled to have the venire information disclosed in time to "permit the IRS to conduct a search of its records for potential jurors' tax histories." The time allowed in this case was sufficient for that purpose.

■■■ Ford also contends that the district court erred in limiting the IRS's disclosure obligation to the last six years' audit history. The district court supplemented the IRS information with a full voir dire on the subject of audit histories, and this satisfied Ford's rights under section 6103(h)(5). *See Spine*, 945 F.2d at 148.

**5.** The former section 6103(h)(5) was repealed by The Taxpayer Relief Act of 1997, 111 Stat. 788, 1038. However, the Act states that the

### IV.

#### A.

■■■ Ford contends that the district court erred in denying his motion for new trial in the gambling case on the ground that he was mentally incompetent to stand trial. Ford's first mention of the competence issue came after trial; his trial counsel filed an affidavit opining that he himself had provided ineffective assistance of counsel by failing to recognize Ford's incompetence and bring it to the court's attention during trial. The district court held a hearing in order to ascertain retrospectively whether Ford had been competent at trial. Ford and the United States produced medical experts who agreed that Ford had some brain damage from strokes and brain atrophy, but who expressed conflicting opinions about Ford's ability to understand the proceedings and assist in his own defense.

■■■ The district court articulated the proper legal standard governing the competence issue: the test is whether Ford had sufficient ability to consult with his lawyers and a reasonable degree of rational and factual understanding of the proceedings against him (quoting *Dusky v. United States*, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960) (per curiam)). The district court considered the testimony of the medical and other witnesses, tapes of Ford made during state court proceedings, and the court's own extensive observation of Ford during the proceedings in these related cases. The court found that Ford did suffer from the effects of strokes and brain atrophy. However, the judge recounted at length his own observations of Ford during the time in question and concluded that Ford was "extremely interested, knowledgeable, and informed about his case, about the proceedings, and about his desire to have his views and his positions known." The court ob-

repeal is effective as to cases commenced after August 5, 1997, 111 Stat. 1038, whereas this case was begun in 1993.

served that Ford's tendency to speak out in the courtroom and to assert control over his own defense may have been strategically inopportune, but that if Ford's decisions were "irrational," they showed only poor trial strategy, not incompetence. The judge found that Ford "did understand the nature and the consequences of these proceedings; and I think that he was able to assist properly in his defense to an extent that was greater and at a higher level than most defendants that I see." The court then denied Ford's motion for a new trial, stating, "From everything that I have in front of me, I will find that retrospectively during the trial, that Mr. Ford had a mental defect or defects but they were not such as to render him mentally incompetent to the extent of inability to understand the nature and consequences of the proceedings and to assist in his defense."

Ford argues that our cases conflict with each other about the proper standard of review of the competency determination. In *United States v. Branham*, 97 F.3d 835 (6th Cir.1996), in which we reviewed a competency determination on direct appeal, we stated: "Because a district court's determination of competency is a factual finding we apply a clearly erroneous standard of review." *Id.* at 855; *accord United States v. Murphy*, 107 F.3d 1199, 1203 (6th Cir.1997). On the other hand, in habeas cases we have characterized the competency determination as a mixed question of law and fact, which is not entitled to the presumption of correctness given to state court findings of fact. *See Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir.1995), *cert. denied*, 516 U.S. 1096, 116 S.Ct. 822, 133 L.Ed.2d 765 (1996); *Levine v. Torvik*, 986 F.2d 1506, 1514 (6th Cir.) (relying in part on *Card v. Singletary*, 963 F.2d 1440, 1443–44 (11th Cir.1992), which was vacated and amended in relevant part, 981 F.2d 481, 483–84 (11th Cir.1992), *cert. denied*, 510 U.S. 839, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993)), *cert. denied*, 509 U.S. 907, 113 S.Ct. 3001, 125 L.Ed.2d 694 (1993). These cases are apparently focusing on different aspects of the competency decision. To determine which standard of review is applicable in this case we must ascertain what aspect of the competency determination Ford attacks.

Ford has not shown that the district court applied the wrong legal standard in deciding the competency question. The district court made no legal error in concluding that Ford was competent notwithstanding evidence that his behavior in court was "cantankerous" or "difficult [for his lawyers] to deal with." *See Vogt v. United States*, 88 F.3d 587, 591 (8th Cir. 1996).

Other than this possible legal point, Ford's argument consists primarily of attacks on the testimony of Dr. Denney, the government's expert. The district court relied not only on Denney's testimony, but also on the court's extensive observation of Ford. Ford also argues that his own attorneys' testimony deserves to be credited, but those attorneys' failure to mention the possibility of incompetence until after trial undercuts the reliability of their more recent opinions that Ford was incompetent during trial. *See Owens v. Sowders*, 661 F.2d 584, 586 (6th Cir.1981). The district court's choice between conflicting evidence is a factual finding and it is not clearly erroneous.

**B.**

■ In a related argument Hutchins contends that the district court erred in denying her motion for new trial based on newly discovered evidence of Ford's incompetence. She argues that Ford's incompetence affected her adversely by preventing her from testifying because: she knew if she testified, Ford would insist on testifying as well, and he lacked the mental capacity to testify without harming both of them before the jury; she was deprived of Ford's testimony that she acted only at his direction in running the gambling business; and she was deprived of a juror she wanted, because Ford tampered with that juror and caused him to be dismissed.

Hutchins argues that the district court should have granted her a new trial on these grounds. The district court denied the new trial motion because it was premised on Ford's incompetence, and the court had just found Ford was competent.

■ We review the denial of Hutchins's motion for new trial based on newly discovered evidence for abuse of discretion. *See United States v. Seago*, 930 F.2d 482, 488 (6th Cir.1991). We have already upheld the district court's finding that Ford was not incompetent. Moreover, Hutchins's claims about the effect of Ford's incompetence on her trial strategy were not "newly discovered" after trial, as she argued in her motion. *See id.* at 489. She obviously was aware of her trial strategy decisions during the trial. Finally, the district court conducted an adequate voir dire to assure that Hutchins suffered no prejudice from Ford's jury tampering. We therefore see no abuse of discretion in the district court's denial of Hutchins's motion.

## V.

■ Ford argues that his convictions under 18 U.S.C. § 1955 are invalid because they are predicated on violation of a Kentucky law that conflicts with the Kentucky Constitution.

Section 1955 makes it a federal crime to conduct a gambling business that is illegal under state law (except that the federal statute exempts games of chance run by charitable organizations, 18 U.S.C. § 1955(e)). Bingo and similar "gift enterprises" are prohibited by the Kentucky Constitution, section 226:

> Except as provided in this section, lotteries and gift enterprises are forbidden, and no privileges shall be granted for such purposes, and none shall be exercised, and no schemes for similar purposes shall be allowed. The general assembly shall enforce this section by proper penalties. All lottery privileges

or charters heretofore granted are revoked.

(The Kentucky Constitution was amended in November 1992, after the date of the offenses in this case, to permit charitable lotteries and gift enterprises.) Kentucky statutes provided criminal penalties for gambling, but provided a charitable gaming defense. Ky.Rev.Stat. Ann. §§ 528.010.10(b)-.120 (Michie 1985); 1990 Ky.Rev.Stat. & R. Serv. ch. 469 (Banks–Baldwin); 1992 Ky.Rev.Stat. & R. Serv. ch. 461 (Banks–Baldwin). The United States suggested in the district court that the charitable gaming defense in the statute conflicted with the Kentucky Constitution, which did not allow a charitable exception to the prohibition of gambling at the time of the events in question. The district court held that it would allow Ford and Hutchins to rely on the charitable gaming exception in the statute on due process and ex post facto grounds, even if the charitable gaming exception were unconstitutional (under the Kentucky Constitution). Accordingly, the court instructed the jury that the United States had to prove that the bingo games were not charitable gaming activity, as defined by Kentucky law.

Despite receiving the benefit of the charitable gaming defense, Ford and Hutchins argued that the defense was unconstitutional and that it rendered the entire Kentucky gambling statute invalid. Without a violation of the Kentucky gambling statute, there would be no violation of 18 U.S.C. § 1955, which is predicated on a violation of state gambling law.

The district court held that, if the charitable gaming defense were unconstitutional, that would not invalidate the rest of the gambling statute. The court relied on Ky. Rev.Stat. § 446.090, which provides:

> It shall be considered that it is the intent of the General Assembly, in enacting any statute, that if any part of the statute be held unconstitutional the remaining parts shall remain in force, unless the statute provides otherwise, or

unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable or being executed in accordance with the intent of the General Assembly.

The court held that the charitable exception was separable from the rest of the statute and therefore did not affect the remaining part of the statute prohibiting gambling.

Ford and Hutchins can point to nothing in Ky.Rev.Stat. chapter 528 stating that the provisions of the chapter are inseparable. Ford and Hutchins argue that it is apparent that the General Assembly would not have enacted the gambling prohibition without the charitable exception, but this argument is untenable. First, the Kentucky Constitution prohibited gambling without a charitable exception before the statute was enacted; it was therefore hardly unthinkable that the General Assembly would obey the command of the constitutional provision to enforce that provision by enacting proper penalties. Moreover, the provisions of chapter 528 making it illegal to promote gambling were enacted in 1974, 1974 Ky. Acts. ch. 406, whereas the charitable exception was not enacted until 1980. 1980 Ky.Rev.Stat. & R. Serv. ch. 267. Accordingly, we reject Ford and Hutchins's Kentucky constitutional argument and their suggestion that we certify the issue to the Kentucky Supreme Court.

## VI.

Ford and Hutchins contend: (1) that the government failed to prove a transaction in interstate commerce to support their money laundering convictions; and (2) that the district court erroneously instructed the jury that it could infer a transaction affected interstate commerce if it involved a bank that was federally insured. The money laundering convictions were based on the deposit in or withdrawal of money from the Bank of Louisville; there was evidence that the Bank of Louisville was insured by the FDIC.

In a challenge to the sufficiency of the evidence, we must affirm if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original). We review the jury instructions to ascertain if the charge as a whole fairly and adequately presents the issues and the law. *United States v. Newcomb,* 6 F.3d 1129, 1132 (6th Cir.1993).

Ford and Hutchins were convicted under 18 U.S.C. § 1957 and Ford was also convicted of one count under 18 U.S.C. § 1956(a)(1)(B)(i). Section 1956(a)(1)(B) forbids knowingly conducting a "financial transaction" with the proceeds of specified unlawful activities knowing that the transaction is designed to conceal or disguise the nature, location, source, ownership, or control of such proceeds. "Financial transaction" is defined to include any transactions involving "the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." Section 1956(c)(4)(B). Section 1957 forbids certain "monetary transactions" in criminally derived property. Under section 1957(f)(1) "monetary transaction" includes any "financial transaction under section 1956(c)(4)(B)" (except those transactions necessary to preserve a person's Sixth Amendment right to representation). Thus, both section 1956 and section 1957 contain interstate commerce elements, which can be satisfied by use of a bank whose activities affect interstate commerce.

Ford and Hutchins argue that proof of a transaction with a federally insured bank does not satisfy the government's burden

of proving a transaction with a bank whose activities affected interstate commerce, *citing United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). In *United States v. Owens*, 159 F.3d 221, 226 (6th Cir.1998), *pet'n for cert. filed*, 67 U.S.L.W. 3749 (May 20, 1999) (No. 98–1912), we rejected a challenge to section 1956 under *Lopez*. We held that section 1956 regulated the instrumentalities of interstate commerce, and therefore was a permissible exercise of Congress's power to regulate interstate commerce. *Id.* We specifically remarked that "the use of federally insured banks and/or the transport of monies across state borders to facilitate the money laundering create a sufficient nexus to commerce to allow application of § 1956." We have recently reiterated that *Lopez* did not raise the standard for proving the interstate commerce nexus in section 1956 and 1957 prosecutions. *United States v. Ables*, 167 F.3d 1021, 1030 (6th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 2378, —— L.Ed.2d —— (1999).

We therefore hold that the proof of the interstate commerce element and the jury instruction on that subject were adequate.

## VII.

Ford and Hutchins were sentenced using the base offense level prescribed by U.S.S.G. § 2S1.2(a) (Nov.1996), the guideline for "Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity," which applies to convictions under 18 U.S.C. § 1957. They claim that the district court erred in declining to depart downward from the guidelines sentencing ranges because transactions in gambling proceeds are atypical of section 1957 offenses and because state law required Ford to deposit the gambling proceeds in the bank. The government's sole response is that the district court's decision not to depart is unreviewable.

At sentencing, Ford and Hutchins argued that their offenses fell outside the heartland of section 2S1.2. The district court concluded that their offenses were not outside the heartland; accordingly, the court reasoned that it was not authorized under 18 U.S.C. § 3553(b) to depart. The court stated:

> [I]f this conduct is outside the heartland, I would consider a downward departure. So that my holding is that because I believe that it is not outside the heartland that I am not able to depart. That will give you the opportunity of raising my failure to depart downward with the Court of Appeals. Otherwise, I think if the court fails to depart, it's pretty tough to get appellate review.

The court articulated three bases for its decision that the offenses were within the heartland of section 2S1.2. First, it rejected Ford's suggestion that the guideline should only apply to transactions connected with drugs or organized crime. The court observed that gambling is included as a kind of activity that generates proceeds subject to section 1957.[6] The court stated:

> The Court believes that the best evidence of legislative intent is the plain language of the statute in the first instance.... [H]ere in 1956, the term, specified unlawful activity, is defined as: "Any act or activity constituting an offense listed in Section 1961(1) of that title."
>
> Now 1961(1), of course, mentioned gambling. Section 1957 references 1956. So I think that the coverage here of gambling in a general sense militates against the Court concluding that in a generic sense gambling activity is outside the heartland of the money-laundering statutes.

---

**6.** Section 1957 applies to transactions in proceeds from "specified unlawful activity" as defined in section 1956, which in turn incorporates by reference the lists of offenses found in 18 U.S.C. § 1961(1). That list includes operation of an illegal gambling business under section 1955.

Second, after concluding that transactions in gambling proceeds were not per se outside the heartland, the court considered whether the particular transactions in this case were outside it. The court held that the magnitude of Ford's aggregated transactions put Ford squarely within the heartland: "I think that here we have significant amounts of cash, large amounts of cash, well over a million dollars worth of money-laundering activity. We have a, what must be described as a fairly large scale operation by Mr. Ford. This was not a backyard dice game." In sentencing Hutchins, the court pointed to the much smaller magnitude of Hutchins's convictions:

> We are talking about $94,000 here.... The fact that there is a smaller amount of money involved is a point to be made. On the other hand, I think looking at the matter as a whole, I am of the opinion that there is not a showing that this conduct is outside the heartland of the money laundering statutes.

Third, the court rejected as a factual matter Ford's explanation of his conduct— that he was required by state law to deposit the charitable gambling proceeds in the bank:

> The argument that there was a lot of money laundering as opposed to a little because Mr. Ford had to deposit money into a bank in order to comply with state law is interesting. I'm not sure that in the context of this entire matter, I can view Mr. Ford's conduct as paying a tremendous amount of attention to obeying the law. In fact, he clearly didn't, at least with respect to the charges in this case.

Although the court made this statement referring to Ford individually, Hutchins's counsel's downward departure argument for the most part simply incorporated Ford's earlier argument by reference, and did not reiterate the compelled-by-state law argument explicitly. The court did not make separate findings on this argument

in Hutchins's case, but simply declined to depart "looking at the matter as a whole."

Ordinarily, a district court's decision not to depart is not reviewable. *United States v. Hill*, 167 F.3d 1055, 1071 (6th Cir.1999). However, if the district court's refusal to depart stemmed from its legal conclusion that the circumstance urged by the defendant was not a valid reason for departure, the decision is reviewable. *United States v. Ebolum*, 72 F.3d 35, 37 (6th Cir.1995); *United States v. Hamilton*, 949 F.2d 190, 193 (6th Cir. 1991). *See also United States v. Watkins*, 179 F.3d 489, 501–02 (6th Cir.1999). The district court's legal determination that it lacked authority to depart on the basis of a certain factor is reviewed de novo. *Ebolum*, 72 F.3d at 37. *See Koon v. United States*, 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996) (whether particular factor is ever a permissible basis for departure is "a question of law").

In determining whether the district court's refusal to depart downward was an exercise of discretion or a legal determination, we must review the sentencing transcript. *Id.* If the record gives us no reason to doubt that the district court properly apprehended its discretion to depart, we will assume it understood that discretion. *Hill*, 167 F.3d at 1071.

Here, the district court's conclusion that transactions in gambling proceeds are not *per se* outside the heartland is a question of law reviewable on appeal. However, the court's determination that Ford was not simply trying to comply with state law when he engaged in the transactions at issue is a refusal to depart based on the exercise of discretion, not reviewable on appeal. Although the court did not make separate findings as to Hutchins on the compelled-by-state-law argument, the record gives us no reason to think the court misunderstood its discretion to depart on the issue. The court's determination that the magnitude of Ford's and Hutchins's transactions did not warrant

departure was apparently an exercise of discretion since the court did not reject the relevance of magnitude to departure, but merely determined that the magnitude in this particular case did not take the offenses out of the heartland of section 2S1.2.[7] Therefore, the court's rejection of magnitude as a basis for departure in this case is not reviewable.

■ Ford and Hutchins contend that their cases are outside the heartland of section 2S1.2 because the money did not come from "serious underlying criminal conduct such as a significant drug trafficking operation or organized crime." They further argue that their case is outside the heartland because they did not undertake the financial transactions to "make it appear that the funds were legitimate" or "to promote additional criminal conduct by reinvesting the proceeds in additional criminal conduct." The government does not brief the merits of the sentencing issues, but confines its discussion of the sentencing issues to its argument that the district court's refusal to depart is not reviewable on appeal.

■ Under 18 U.S.C. § 3553(b) (1994), a court must sentence within the guidelines range

> unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described. In determining whether a circumstance was adequately taken into consideration, the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission.

The policy statement at Ch.1, Pt. A 4(b) refers to these unforeseen circumstances as taking the offense out of the "heartland" of the guideline:

> The Commission intends the sentencing courts to treat each guideline as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted. Section 5H1.10 (Race, Sex, National Origin, Creed, Religion, and Socio–Economic Status), § 5H1.12 (Lack of guidance as a Youth and Similar Circumstances), the third sentence of § 5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse), and the last sentence of § 5K2.12 (Coercion and Duress) list several factors that the court cannot take into account as grounds for departure. With those specific exceptions, however, the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case.

If a factor is already taken into account in the guidelines, the court "should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Koon*, 518 U.S. at 96, 116 S.Ct. 2035. *Accord*, U.S.S.G. § 5K2.0 (Policy Statement) ("[T]he court may depart from the guidelines, even though the reason for departure is taken into consideration in determining the guideline range (*e.g.*, as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the weight

---

7. The question of magnitude could have been a legal issue if the district court had made its decision on the basis that the threshold amount of $10,000 is listed in section 1957 and the background commentary to section 2S1.2, and that the Sentencing Guidelines had therefore already taken magnitude into account. Cf. *United States v. Bifield*, 42 F.Supp.2d 477, 485 n. 4 (M.D.Pa.1999) (money laundering guidelines take into account monetary amount). The district court did not take this tack.

attached to that factor under the guidelines is inadequate or excessive.")

Ford and Hutchins argue that a departure was warranted because there was no showing of intent to conceal the origin of the funds or that the funds were used to promote further illegal activity. The background note to section 2S1.2 specifically states that section 1957 "does not require that the recipient ... have any intent to further or conceal [the specified unlawful activity]." Lack of intent to conceal or promote the unlawful activity has already been considered in the guideline and commentary, and Ford and Hutchins have not shown any unusual circumstances rendering the guidelines' consideration inadequate in their case.

■ They also contend that the thrust of the "money-laundering" guidelines is to punish money laundering resulting from "serious underlying criminal conduct such as drug trafficking and organized crime." If they mean to suggest that transactions in gambling proceeds are not qualitatively the sort of conduct meant to be punished, the guidelines must also be said to address this question; the application note to section 2S1.2 references section 1961(1), which includes operation of a gambling business. Though the application of section 1957 to transactions stemming from offenses unrelated to drug trafficking and organized crime is clearly not unforeseen, either by Congress or the Sentencing Commission, some courts justifying a departure have noted the absence of these prototypes. For instance, in *United States v. Woods*, 159 F.3d 1132, 1134–35 (8th Cir.1998); *United States v. Hemmingson*, 157 F.3d 347, 361–63 (5th Cir.1998); and *United States v. Caba*, 104 F.3d 354 (table), No. 96–1069(L), 1996 WL 685764 at *3 (2d Cir.1996) (unpublished), Courts of Appeals affirmed departures based in part on the fact that the underlying offenses, though literally within the statute, were not drug-trafficking, "organized crime," "serious money-laundering," or "unusually severe fraud." On the other hand, in

*United States v. Adams*, 74 F.3d 1093,1102 (11th Cir.1996), the Eleventh Circuit reversed a district court that departed on the ground that the case before it did not involve "classic money laundering." Similarly, in *United States v. LeBlanc*, 24 F.3d 340, 346–47 (1st Cir.), *cert. denied*, 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994), the First Circuit held it was error not to sentence deposit of gambling proceeds under the money laundering guidelines, since section 1956 covers a far broader array of crimes than "classic money laundering" involving drug proceeds. *See also United States v. Conley*, 37 F.3d 970, 981 (3d Cir.1994) (legislative history of Money Laundering Control Act of 1986 indicates illegal gambling was an area of concern).

■ The Sentencing Commission itself has attempted to modify the guidelines to narrow the money-laundering provisions, which, the Commission discovered, were so wide-ranging that severe money-laundering sentences were "being imposed for a much broader scope of offense conduct, including some conduct that is substantially less serious than the conduct contemplated when the ... guidelines were first formulated." United States Sentencing Comm'n, *Report to the Congress: Sentencing Policy for Money Laundering Offenses, including Comments on Department of Justice Report*, 5 (Sept. 18, 1997). In 1995, the Commission proposed a comprehensive revision of the money-laundering guidelines in an attempt to make the punishment fit the crime. *Id.* at 2. Specifically, the Commission sought to "recalibrate the penalties to the seriousness of the underlying offense." *Id.* at 10.

The Commission's proposed guideline changes, unlike the current guidelines, were also designed to avoid arbitrarily determined, heightened penalty levels in those situations where a financial transaction may *technically* violate the money laundering statutes but not present additional societal harm sufficient to merit substantially more severe sanctions than

those appropriate for the underlying offense from which the illicit funds were generated.

*Id.* at 11. However, Congress disapproved the revision, and section 2S1.2 remains in place substantially unaltered. *Id.* at 2. In determining whether a circumstance was adequately taken into consideration by the Sentencing Commission, 18 U.S.C. § 3553(b) limits our consideration to the guidelines themselves, the official commentary and the policy statements; we therefore may not base our decision on the Commission's proposed amendment. *See United States v. Morelli,* 169 F.3d 798, 809 n. 13 (3d Cir.1999) ("[P]roposed amendments to the Sentencing Guidelines do not provide independent legal authority for a downward departure."), *cert. denied,* 67 U.S.L.W. 3758, 1999 WL 386749 (1999).

■■■■ We conclude that the inclusion of gambling offenses within the money laundering statutes as "specified unlawful activities" shows conclusively that an offense is not outside the heartland *merely* because it involves gambling proceeds rather than drug or organized crime proceeds. There may, of course, be articulable reasons why a particular gambling case does not threaten the kind of harm Congress aimed at preventing, but Ford and Hutchins have not shown any. Without some showing of particular factors "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines," *United States v. Reed,* 167 F.3d 984, 995 (6th Cir.1999) (quoting section 3553(b)), the district court should not depart.

### VIII.

■■■ Hutchins argues that the district court erred in denying her motion for severance and mistrial after there was an allegation that Ford had contacted a juror during trial. The district court removed the juror whom Ford had allegedly contacted. The court examined the remaining jurors individually and assured itself that they had not been affected by the impropriety. The court denied Hutchins's severance and mistrial motion.

The jury acquitted Hutchins on Count I, but convicted Ford on that count.

■■■■ We review the district court's ruling on severance and mistrial motions for abuse of discretion. *United States v. Lloyd,* 10 F.3d 1197, 1215 (6th Cir.1993) (severance), *cert. denied,* 511 U.S. 1043, 114 S.Ct. 1569, 128 L.Ed.2d 213 (1994); *United States v. Chambers,* 944 F.2d 1253, 1263 (6th Cir.1991) (mistrial), *cert. denied,* 502 U.S. 1112, 112 S.Ct. 1217, 117 L.Ed.2d 455 (1992). The record shows the district court conscientiously investigated the effect of Ford's impropriety on the remaining jurors and reasonably concluded that they were not tainted. The court's conclusion that the jurors could consider Hutchins's guilt separately from Ford's was borne out by the jury's acquittal of Hutchins and conviction of Ford on Count I. There was no abuse of discretion.

### IX.

■■■ Hutchins was convicted of two counts of aiding and abetting transactions with criminal proceeds, 18 U.S.C. § 1957, for her deposit of two checks drawn on the RVA Ladies' Auxiliary account, in the amounts of $75,000 and $19,000, into the RVA Post No.1 Bank of Louisville account. Both checks were signed by Hutchins and Ford and both checks were imprinted: "Checks over $2,000.00 require two signatures." Hutchins contends that for checks over $2,000, Ford's signature was required, but that hers was not. She cites a bank signature card for the Ladies' Auxiliary with these instructions: "Don Ford may sign any checks– Checks over $2000.00 signed by Sandy Hutchins requires signature of Don Ford too." Hutchins argues that her signature was gratuitous and therefore of no legal effect.

Leaving to one side the legal impossibility conundrum Hutchins poses, her argu-

ment fails on the facts. Regardless of what the bank signature card said, the check itself was printed with the instruction that two signatures were needed for checks over $2,000. Hutchins's signature would have avoided the obvious difficulty of negotiating a check in contravention of instructions printed on the face of that check. Her part in negotiating the check satisfies the actus reus requirement of 18 U.S.C. § 1957 and 18 U.S.C. § 2 of aiding and abetting a monetary transaction with criminally derived funds.

 . . . . .

In sum, we reverse Ford's tax conviction, but affirm Ford's and Hutchins's gambling and money laundering convictions. We reject their challenges to the district court's refusal to depart downward. However, because Ford's tax conviction evidently affected the criminal history category used in his sentencing on the gambling and money laundering convictions, we remand for resentencing.